## Case No. 2,589.

The CHANCELLOR.

[4 Ben. 153.][1]

District Court, S. D. New York. May, 1870.

COLLISION AT SEA — SHIP AND FISHING VESSEL— VESSEL AT ANCHOR—FOG—SIGNALS—SPEED.

1. The schooner B., an American fishing vessel, while at anchor on the Grand Bank of Newfoundland, was run down in a dense fog by the ship C. and sunk, on the 22d of September, 1866. The ship was going at the rate of about six knots an hour, under full sail except studding sails, and a fog horn was being blown upon her, at intervals of about ten seconds. No horn was blown or bell rung on the schooner during the day of the collision, till after the horn of the ship was heard, when a horn was blown, and, on hearing a second blast from the ship's horn, the horn was again blown and then a bell was rung. On hearing the horn from the schooner, the ship's wheel was ordered to be put to port, and had been got about half over to port, when the bell was heard, and it was ordered to be put hard-a-starboard, but before it was got half way over to starboard the collision occurred: *Held*, that usually, in a suit in rem for collision. the first question is, whether the vessel sued was in fault, and not till that fact is established does the inquiry arise whether the libellant's vessel was in fault.

2. The schooner being at anchor was grossly in fault, in not sounding her bell, as required by article 10 of the regulations for preventing collisions, and in blowing a horn on hearing the horn from the ship.

[Cited in The Scotia, Case No. 12,513.]

3. In view of the sounds she heard from the schooner, the manoeuvres of the ship were the proper ones.

4. These violations of the law by the schooner being shown, the burden of proof was upon her to show that the collision was in no degree owing to them.

5. The requirement of article 10, of the regulations for preventing collisions, that a bell shall be sounded at least every five minutes,

whenever there is a fog, means, that, in any case, the bell must be sounded as often as once in five minutes, and as much oftener as the special circumstances of the case shall require.

6. The speed of vessels in a fog should be moderate.

[Cited in The Hansa, Case No. 6,037.]

7. The burden of proof was upon the schooner to show that the collision was owing to too great speed on the part of the ship; and, this not being shown affirmatively, the schooner alone was liable for the collision.

[In admiralty. Libel by the owners of the schooner Bride against the ship Chancellor for damages for the loss of the schooner by collision.]

J. H. Choate, for libellant.

W. R. Beebe and C. Donohue, for claimant.

BLATCHFORD, District Judge. The schooner Bride, an American fishing vessel, owned by the libellant and one Henry B. Taylor, who was her master, and was on board of her, as such, at the time, was at anchor on the Grand Bank of Newfoundland, on the 22d of September, 1866, in the pursuit of her business as a fishing vessel, in a dense fog, when, at about twenty minutes past four o'clock in the afternoon of that day, she was run down and sunk by the ship Chancellor, then on a voyage from New York to Liverpool. The starboard side of the schooner was struck by the stem of the ship, and, of ten persons composing the company of the schooner, all perished but one. This suit is brought to recover the sum of $8,400 as damages for the loss of the schooner and her outfit, and of the fish and oil on board of her at the time. The interest which belonged to Taylor has become vested in the libellant.

There are several facts in the case which are undisputed. The wind at the time was from south south-west to south-west, blowing a moderate breeze. The ship was heading east by south half south, the wind being, therefore, from half a point to two points and a half abaft the beam of the ship on her starboard side. The fog had been prevailing for four or five days, and was so thick that nothing could be seen more than half the length of the ship ahead. The ship was on her starboard tack, under all her canvas except her studding sails, and going about six knots an hour, and a fog horn was being blown upon her at intervals of about ten seconds, by a lookout man who was stationed on the top gallant forecastle. There were two men at her wheel, the master was standing on the starboard quarter near the wheel, and had been there for about half an hour before the collision, and the officers and crew were all of them on deck. There were four officers and twenty-eight men before the mast. The latitude of the ship, at noon that day, was 45° 30′ north, and her longitude at the same time was, by dead reckoning, about 49° west. The schooner had anchored at

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

the place where she was struck, on the previous evening. She was in about thirty fathoms of water, and at a point between thirty and forty miles to the southward of the eastern shoals of the Grand Bank of Newfoundland.

The libel avers, that, as soon as the proximity of the ship was known or suspected on board of the schooner, the master of the schooner blew loud blasts upon a horn, and her mate rang loudly a bell upon her forecastle. The answer avers, that it is the custom, on the Grand Banks, in fogs, for vessels under way to blow, at intervals of fifteen or twenty seconds, a fog horn, and for vessels at anchor to sound, at intervals of a few seconds, a bell, and in that way give notice to approaching vessels as to whether they are under way or at anchor; that the ship had a full watch on deck, with two men at the wheel, and a competent lookout; that a fog horn was sounded on board at intervals of from ten to fifteen seconds; that, while the ship was sailing through the fog, a horn was heard ahead, and, as the sound indicated, a little on the starboard bow; that the wheel of the ship was then put to port, no object being at the time visible ahead; and that, by the time the wheel had been put half way down, a bell was heard, and almost immediately the schooner loomed up ahead in the fog and at anchor, and the wheel was at once ordered to be put hard a-starboard, but, before the order could be fully obeyed, and the course of the ship be changed, she came in contact with the schooner.

Ordinarily, in a suit in rem for a collision, the first inquiry to be made is, whether the vessel sued was in fault, and not until it is established on the part of the libellant, that the vessel sued was in fault, does any inquiry arise, as to whether the libellant's vessel was in fault. But, in this case, the facts are such, that the determination of the question whether the ship was in fault, must depend upon the determination of the question whether the schooner was in fault. The 10th article of the "regulation for preventing collisions on the water," contained in the act of April 29th, 1864 (13 Stat. 60), provides as follows: "Whenever there is a fog, whether by day or night, the fog signals described below shall be carried and used, and shall be sounded at least every five minutes, viz: (a) Steamships under way shall use a steam-whistle placed before the funnel, not less than eight feet from the deck. (b) Sailing ships under way shall use a fog horn. (c) Steamships and sailing ships, when not under way, shall use a bell." In this case, the evidence shows, that the company of the schooner were all of them on deck, except the cook and the captain; that four of them had their lines out, fishing; that no bell had been rung or any horn blown on the schooner during the day, although she had a bell

hung on a post near the windlass, and several horns convenient of access, one of them being hung in the companion way leading to the cabin from the deck; that, suddenly, a blast from the ship's horn was heard on board of the schooner; that the captain of the schooner then came on deck and blew a horn; that then the sound of a horn from the ship was again heard on board of the schooner; that the captain of the schooner then blew a horn a second time, and the bell of the schooner was rung, and the ship was heard and seen close upon the schooner; that the lookout on the topgallant forecastle of the ship heard and reported the sound of the horn from the schooner, nothing being visible through the fog, but it does not appear, that the sound of more than one of the blowings of the horn on the schooner was heard on the ship before the collision; that, immediately on the hearing of the horn from the schooner, the wheel of the ship was ordered by her master to be put to port, the sound of the horn being heard faintly by him from ahead but a little on the starboard bow of the ship; that the helm of the ship had been got about half to port, when a bell was heard from the schooner; that thereupon the helm of the ship was ordered by her master to be put hard a-starboard, but, before it was got half over to the starboard, the collision occurred; that, when the master of the ship heard the horn from the schooner, he, from the course of the sound and the direction of the wind, took it to be from a vessel under canvas, under way, on her port tack, and, therefore, crossing his bows from his starboard to his port side; that he, therefore, ported his helm, to let her pass on his port side; and that, on hearing her bell, he concluded she was at anchor, and a little on his starboard hand, and, consequently, tailing to his port hand, and, therefore, he then starboarded, to pass under her stern. It is quite apparent, from the proofs, that, when the horn of the schooner was first heard on board of the ship, the ship was so close upon the schooner that a collision was almost inevitable; that there was no substantial, if there was any, change in the course of the ship, by either the porting or the starboarding of her helm; and that the manoeuvres of the ship were the proper ones, in view of the sound she heard from the schooner. Now, on all these facts, it is impossible to deny that the schooner was grossly in fault. She violated the law of navigation by lying at anchor without sounding her bell at all. When aroused to a sense of her danger and her duty, by hearing the fog horn of the ship, she violated the law again by sounding a horn instead of a bell, and by not sounding a bell until after she had heard the horn of the ship a second time. These violations of law being shown, the burden of proof is upon the schooner to show that the collision was in no degree owing to any such violation. Waring v. Clarke, 5

How. [46 U. S.] 441, 465. In this case, the schooner has, I think, failed to show that the collision was not in some degree attributable to the violations of law by the schooner. She has not shown that, if she had sounded a bell from time to time, and as often as was demanded, in view of the thickness of the fog, and of the location of her anchorage, and of the state of the wind, prior to her having heard the fog horn of the ship, such bell would not have been heard by the ship, and thus have indicated a vessel at anchor, and tailing, with the wind, towards the port side of the ship, in season for the ship to have had a chance of avoiding the collision, by starboarding the moment the bell was heard, and passing under the stern of the schooner. Nor has the schooner shown, that if, when she sounded a horn, after hearing the horn of the ship, she had sounded a bell instead, there would not have been time for the ship to have, at least, mitigated the collision, by starboarding instead of porting. As the schooner was motionless, it is apparent that but a slight change of direction in the heading of the ship towards the stern of the schooner, a comparatively short distance away, would either have caused her to clear the schooner, or to strike the schooner a glancing or angular and, probably, less disastrous blow, near the stern of the schooner. I think, on the evidence, that, with the vigilance and promptitude of movement which are shown to have existed on board of the ship, the proper and timely use of the bell by the schooner, both before and after the fog horn of the ship was heard, would have changed the state of things materially. In regard to the use of the bell by the schooner before the horn of the ship was heard, it is to be observed, that the requirement of article 10 is, that the bell shall be sounded at least every five minutes, whenever there is a fog. This does not mean that it shall be a sufficient compliance with the law to sound the bell as often as once every five minutes, in any fog. It means that it shall not be a sufficient compliance with the law to sound the bell less often than once every five minutes, in any fog. The 20th article declares that nothing in the rules shall exonerate any vessel from the consequences of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case. In any fog, the bell of a vessel at anchor must be sounded at least once in every five minutes, and as much oftener as the thickness of the fog, or the fact that she is anchored in a route frequented by other vessels, or the state of the wind or weather, or the ordinary practice of seamen at the locus in quo, or the special circumstances attending the case, may require, as a proper precaution, the neglect of which there is reasonable cause to believe may prove disastrous. It is shown, by the proofs in this case, that it is the custom, on the Grand Banks, in a fog, for a vessel at anchor to ring a bell every ten or fifteen seconds, and for a vessel under canvas, under way, to blow a horn at the same intervals. Such a custom is a reasonable one, and is one of the precautions required by the ordinary practice of seamen, referred to in article 20, and is to be rigidly enforced by the courts. It is a custom in harmony with the requirements of article 10. The bell must be sounded, or the horn must be blown, or the steam whistle must be used, as much oftener than once in every five minutes, as is required by the use of reasonable precaution under the circumstances of each case. In the present case, the fog was of extraordinary thickness, the schooner was lying in the track of merchant ships running from New York to Liverpool, and the vessel under canvas, which struck her, was using a fog horn every ten seconds. Yet the schooner was guilty of such gross neglect as to sound no bell at any time before hearing the horn of the ship. The schooner was, therefore, in fault, and responsible for the collision, at least, in part.

Was the ship in fault? The general charge made in the libel against the ship is, that she was recklessly, negligently or carelessly managed by those navigating her. There is, in the libel, no specific allegation as to what the faulty management on the part of the ship was. As already stated, no fault can be found with what was done on board of the ship, after the proximity of the schooner was made known. The ship was manoeuvred as she ought to have been, in view of the indications given by the sound from the schooner. A fog horn, a little on the starboard bow of the ship, with the wind just abaft the beam of the ship on her starboard side, indicated a vessel under canvas, under way, crossing from the starboard side to the port side of the ship, and, therefore, the helm of the ship was properly put to port. The bell indicated a vessel not under way, and probably at anchor, and, with the wind as it was, if at anchor, tailing to the port side of the ship, and, therefore, the helm of the ship was properly put to starboard. Nor was any thing left undone on board of the ship, after the sound from the schooner was heard, which ought to have been done. The only serious charge against the ship is, that she was sailing at too great a speed, in view of the thickness of the fog. The testimony is, that the breeze was a moderate one, that the ship was going about six knots an hour, and that she had all her canvas on except her studding sails. In the case of The Itinerant, 2 W. Rob. Adm. 236, 243 (decided in 1844), Dr. Lushington says: "It is unquestionably the duty of every master of a ship, whether in an intense fog or great darkness, to exercise the utmost vigilance, and to put his vessel under command, so as to secure the best chance of avoiding all accidents, even though such precautions may occasion some delay in the prosecution of the voyage.

It may be that for such purpose it would be his duty to take in his studding sails; but such is the constantly varying combination of circumstances, arising from locality, wind, tide, number of vessels in the track, and other considerations, that the court cannot venture to lay down any general rule which would absolutely apply in all cases. In the present instance, the opinion of the court is, that it might have been prudent for the Itinerant to have taken in her studding sails; but the court is also of opinion, and so were the gentlemen by whom it was assisted at the hearing of this case, that the collision was not occasioned by the omission of the Itinerant so to do, but that the state of the weather was such that the accident would have occurred, even although this precaution had been adopted." In the case of The Lord Saumarez, 6 Notes Cas. 600 (decided in 1848), Dr. Lushington says, addressing the Trinity masters: "It appears that shortly previous to and up to the time of the collision, the Lord Saumarez was proceeding under all her sails set, with the exception of having taken in her lower studding sails; and it has been contended, on the one side, that, considering the state of the wind and weather and the locality, the Lord Saumarez ought not to have carried so large a press of sail; while, on the other hand it is said, that, whatever might be the quantity of sail she carried, it was not at all instrumental to the collision and to the damage in question. In support of the latter averment, the case of The Itinerant was cited. Now it is most important that this question should not be subject to misapprehension, and you will excuse me for referring to what took place in The Itinerant, and showing what is the real principle which the court adopted, sanctioned by the gentlemen of the Trinity House, in this matter. Perhaps I had better first state the general principle. When a ship is carrying a great press of sail, it does not necessarily follow, though it may be an act of imprudence, that it contributes to the collision itself; and, if it is not the cause of the collision, but simply an act of imprudence, not promoting the collision, it is a circumstance to be entirely laid out of the case. But if, on the other hand, looking to the state of the wind and the weather, an improper press of sail was contributory to the collision, then it is a misdemeanor for which the party so acting must suffer. In the case of The Itinerant * * * the court pronounced that the collision was the result of inevitable accident. * * * Now, in that case, the fog was of the very densest character, so that the two vessels could not descry each other until they were in almost immediate contact; and, although the gentlemen by whom I was then assisted were of opinion that the Itinerant was, in one sense of the word, to blame in carrying so great a press of sail, yet, looking at the whole case, they considered that the carrying

such sail was not contributory to the collision, and, under these circumstances, I could not hold that vessel to blame. But let it not go forth, as by your authority, that, whatever may be the circumstances of the case a vessel is at liberty to carry a great press of sail, to the imperilling the safety of other ships. That never was a doctrine laid down by this court or by your board. In the present case, looking at all the circumstances and at the locality, considering whether it was a track in which it was likely to meet other vessels, you will have the goodness to state to me presently, whether you are of opinion that the carrying so large a press of sail, was or was not contributory to this collision; whether, if less sail had been carried, some time would have been allowed, after the discovery of the vessel, to adopt those measures which ought to have been taken to avoid the collision." The decree was against the Lord Saumarez, because it was held that the primary cause of the collision was her putting her helm to starboard, contrary to the rules laid down by the Trinity House, but the Trinity masters remarked, that, in the situation in which that vessel was, it would have been more prudent for her to have had no studding sails at all. I have cited these eminently just and practical views of Dr. Lushington, not only because of their applicability to the present case, but for the purpose of showing how little countenance is given by courts of admiralty, to such views of the duty of the masters of vessels which are sailing in a fog, as were advanced by the witnesses examined on the part of the claimant in this case. One of them stated that he never shortened sail, in all his experience, in a fog, his view being, that the faster the ship goes, the quicker she will answer her helm, and, therefore, the less the danger of colliding with another vessel. Another witness stated, that the proper course, in a fog, is, not to shorten sail at all, but to go as fast as you can, and take the chances, using every prudent precaution. Another stated, that he never made less sail on account of a fog, and that the rule is to go as fast as you can, consistently with wind and weather. Another stated, that it is prudent to go as fast as you can, through a fog, as long as the masts hold in. Another stated, that he never diminishes his speed in a fog on the Banks, his object being to get through the fog as quickly as possible, lest he should be run into. Another stated, that he always crosses the Banks in a fog as fast as he can, and that it is not more dangerous to a vessel, at anchor there, in a fog, for another vessel to go fast than to go at less speed. One of these witnesses is the master of a steamer plying regularly between New York and Liverpool. He says, that, while crossing the Banks in a fog, it is not his custom to diminish his rate of speed at all; that he generally goes ten or eleven knots an hour, through a fog, on the Banks; and that from three hundred to four hundred yards is

the furthest distance at which you can hear a fog horn or a bell. This practice, if it be one, of not diminishing speed in a fog on the Banks, is directly, so far as steamers are concerned, in the face of the 16th article of the sailing rules, which provides that every steamship shall, when in a fog, go at a moderate speed. The rule that there must not be too much speed in a fog has also been applied to sailing vessels, under varying circumstances, depending upon the particular facts of the case. The Virgil, 2 W. Rob. Adm. 201; The Victoria, 3 W. Rob. Adm. 49; The Pepperell, 1 Swab. 12; The Robert & Ann v. The Lloyds, Holt, Rule of the Road, 55. Two prominent ideas were advanced by the witnesses for the claimant in this case, as justifying undiminished speed in a fog on the Banks. One was, that the danger to any vessel in a fog is greater the longer she remains in the fog. The other was, that the faster a vessel is going the more quickly will she mind her helm, and thus the better will she be able, on a signal of danger, to avoid colliding with another vessel, in a fog. Neither of these ideas has any sanction in the law, and any vessel which acts upon them takes upon herself the consequences of recklessness. The first idea disregards wholly the rights and the safety of other vessels. The other idea presupposes that a signal of danger, proceeding from a vessel unseen in a fog, to another vessel, will necessarily be heard so seasonably, and acted upon so intelligently, by the latter, as to secure, by a proper movement of her helm, the avoidance of a collision. The true rule of law is laid down by Dr. Lushington, in the case of The Virgil, 2 W. Rob. Adm. 201, 205. He says: "If a vessel charged with having occasioned a collision, should be sailing at the rate of eight or nine miles an hour, when she ought to have proceeded only at the speed of three or four, it will be no valid excuse for the master to aver that he could not prevent the accident at the moment it occurred, if he could have used measures of precaution that would have rendered the accident less probable. It may undoubtedly be important that a voyage should be completed in the most speedy manner, but such speed must be combined with safety to other vessels sailing in an opposite course. This is the doctrine of the courts of admiralty, in cases of this kind."

I have made these observations because of the character of the testimony introduced on the part of the claimant in this case, and because no sanction is intended to be given, by the decision in this case, to the doctrines advanced on the part of the claimant, through his witnesses, as to the rule by which vessels have a right to govern themselves, in regard to the proper rate of speed in a fog. Each case must be judged of by its own circumstances, for, what would be not too great a rate of speed in a fog, under one state of facts, would be too great a rate, under another state of facts. Yet, there are general rules for the government of vessels, as to their rate of speed in a fog, based upon uniformity of principle and leading to uniformity of decision. The Itinerant, 2 W. Rob. Adm. 236, 242.

In the present case, in view of the fault on the part of the schooner in not sounding her bell at all, while at anchor, before she heard the horn of the ship, and in view of her further fault in misleading the ship, by sounding her horn, instead of her bell, after she had heard the horn of the ship, and in view of the fact that, the burden of proof being on the schooner, to show that the collision was not the consequence of such faults, she has not so shown, and in view of the fact, that the burden of proof is on the schooner, to show that the collision was owing, in any degree, to the too great speed of the ship, I cannot come to the conclusion, on the evidence, that it is shown affirmatively that a too great speed on the part of the ship contributed to the collision. On the contrary, the weight of the evidence is, that, if the schooner had not committed the faults she did, the ship would not, even at the speed she had, have collided with the schooner. The evidence does not show any such actual known proximity of other vessels, in the vicinity of the place of collision, at or about the time of the collision, or any such probability of meeting other vessels there, either under way or at anchor, as to make the actual speed of the ship at the time, in view of the wind, and of the sail she had on, and of all other attending circumstances, a reckless one. Therefore, I cannot pronounce the ship in fault. The libel must be dismissed, with costs.