## THE CHATTAHOOCHEE.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIRST CIRCUIT.

No. 27. Argued March 6, 1899. — Decided April 3, 1899.

The Golden Rule, a Canadian topsail schooner with twelve sails, all of which with a small exception she was carrying, was sailing off Nantucket Shoals at a speed of seven knots an hour, in a fog so dense that the hull of another vessel could not be seen more than a few hundred feet off. The Chattahoochee, an American steamer, came up at an angle in the opposite direction with a speed of ten or twelve knots an hour. The schooner was sounding a foghorn, and the steamer a steam whistle. When the steam whistle was heard on the schooner she kept on her way at full speed. When the foghorn was heard on the steamer, order was given and obeyed to stop and reverse, and the wheel was put hard-a-port. Upon seeing the schooner the steamship engines were put at full speed ahead, for the purpose of clearing it; but a collision took place, and the schooner sank almost immediately. The sunken vessel had a valuable cargo on board. It was held below that both vessels were in fault for immoderate speed, and the District Court, ruling that the damages should be divided, made a decree respecting such division which was modified by the Court of Appeals as hereafter stated. *Held:*

(1) That there can be no doubt as to the liability of the steamer, and, as no appeal was taken on her part she is estopped from denying that liability here;

(2) That the schooner, also, was proceeding at an immoderate speed, and was properly condemned therefor; and the cases bearing

upon the question of what is immoderate speed in a sailing vessel, under such circumstances, are cited and reviewed;

(3) That the Court of Appeals did not err in deducting half the value of the cargo from half the value of the sunken schooner, and in limiting a recovery to the difference between these values; and in reaching this conclusion the court cites and reviews several cases, in deciding which the act known as the Harter Act has been considered and applied.

THIS was a libel for a collision which took place in the early morning of July 20, 1894, southeast of Nantucket Shoals, between the Canadian schooner Golden Rule and the American steamship Chattahoochee, resulting in the total loss of the schooner and her cargo.

The Golden Rule was a topsail schooner hailing from Liverpool, Nova Scotia, of about 200 tons burden, and rigged with twelve sails, including one double square sail on the foremast. Her length over all was 110 feet. She was bound on a voyage from Porto Rico to Boston with a full cargo of sugar and molasses, and, at the time of the collision, was sailing on her port tack, upon a course north by east, one half east, with a free and fresh wind five to six points abaft the beam. She was under full sail, except one half of the square sail forward, which was taken in about two hours before the collision. Her speed was the main point in dispute. At the time of the collision the weather was foggy, the wind blowing in moderate breezes from the southwest, and the mate was sounding a mechanical foghorn forward.

The Chattahoochee was an iron screw steamship of 1887 tons burden, 300 feet in length, and running on a line between Boston and Savannah. She left Boston in the afternoon of the 19th, and when off Cape Cod, her master, owing to the foggy weather, decided to take the outside passage by Nantucket, instead of her regular course through Vineyard Sound. The outside course was much clearer of vessels. Before the collision the steamship was eighteen miles off the South Shoal Lightship, on a course southwest half west, proceeding at her full speed of from ten to twelve knots an hour, and blowing her whistle at the statutory intervals after 12.30 o'clock. The

master and the first officer with the quartermaster were in the pilot-house, and a man was on the lookout forward.

From the above statement it will be seen that the two vessels were approaching upon courses which converged at an angle of about three points.

The officers of the schooner heard the steamship's whistle from two to four points off the starboard bow, a fact which was duly reported to the officer of the deck. The whistles of the steamship continued to be heard on the starboard bow until she came in sight some four or five lengths off, the schooner keeping her course and speed until the collision.

The master and lookout of the steamship heard the fog signal of the schooner about two minutes before the collision, apparently a point off their port bow. The order was immediately given and obeyed to stop and afterwards to reverse, and the wheel was put hard-a-port in order to locate the sound. When they first saw the sails of the schooner they bore one and one half points on the port bow of the steamer. During this time the helm of the steamer was hard-a-port. Upon seeing the schooner, the steamship, which was then swinging to starboard under her port helm, ordered her engines full speed ahead for the purpose of clearing the schooner. The schooner kept her course and the vessels came together at an angle of four points, the steamship striking the schooner forward of the foremast on the starboard side, sinking her almost immediately. The collision resulted in a total loss of the schooner with all her cargo and property on board. The steamship was uninjured.

The District Court was of opinion that both vessels were in fault for immoderate speed, and that the damages should be divided.

Damages were awarded to the libellants, as bailees for the owners of the cargo, to the amount of $17,215.17, and to the libellants, as owners of the vessel and for the value of certain personal effects of the crew, in one half the total amount of their loss, namely, $9205.45; and it was further ordered that the owners of the steamship might recoup from the said amount of $9205.45 the sum $8607.58, being one half of the

total damages to the cargo. An execution was ordered against the claimants of the steamship and its stipulators for the sum of $597.87, this being the difference between half the value of the schooner and the personal effects of the crew and half the value of the cargo for which the schooner was thus held responsible.

Upon appeal to the Circuit Court of Appeals, that court affirmed the decree of the District Court upon the merits; but modified the same with reference to the distribution between the owners and master of the Golden Rule on the one side and her mate and crew on the other, finding that, as neither the mate nor her crew were responsible for any fault in her navigation, the several sums awarded the mate and crew should have priority over the amounts awarded the owners and master. 33 U. S. App. 510.

Whereupon an application was made to this court by the libellants for a writ of certiorari, which was granted.

*Mr. Eugene P. Carver* for the Golden Rule and her owners. *Mr. Edward E. Blodgett* was on his brief.

*Mr. Arthur H. Russell* for the Chattahoochee and her owners. *Mr. Charles Theodore Russell* was on his brief.

Mr. Justice Brown delivered the opinion of the court.

There can be no doubt whatever of the liability of the steamer, and as she did not appeal, of course she is estopped to deny such liability in this court.

1. Whether the Golden Rule was also liable for excessive speed is a question of more difficulty. She was a topsail schooner, rigged with twelve sails, all of which she was carrying, except one half her double square sail on the foremast, which had been taken in. She was sailing on her port tack with the wind well abaft the beam, through a fog which did not admit of the hull of a vessel being seen more than a few hundred feet distant. It appears to have been a surface fog, as the crew of the schooner are confident they saw the masts

of the steamer some 2000 feet away. The District Court was of opinion that as she was sailing free, with a fresh wind, her speed could not have been less than seven or eight knots an hour. The Court of Appeals found only that she was making substantially all the speed of which she was capable. Her master admits that she was making from five to six knots; but as her log, which was taken in at 4 o'clock, registered twenty-eight miles for four hours, we think her speed may be safely estimated to have been seven miles an hour. While the commerce in this locality was not as great as it was in Vineyard Sound, it was not unlikely that they would encounter other vessels coming down the coast. Was seven miles a moderate rate of speed under the circumstances of this case?

Although the reports of the admiralty courts are extremely fertile of cases turning upon the proper speed of steamers in foggy weather, there is a singular paucity of such as deal with the speed of sailing vessels. Such as there are, however, point to a uniformity of regulation applicable to the two classes. The earliest of these cases is that of *The Virgil*, (1843) 2 W. Rob. 201. This was a collision between two sailing vessels in a dark and hazy night, although there does not seem to have been a fog. As it appeared that the Virgil had the wind free, and was sailing under a full press of canvas, she was held in fault for too great speed. Her actual speed is not given. In the case of *The Victoria*, 3 W. Rob. 49, a vessel running before the wind on a dark and cloudy night at the rate of from five to six knots an hour off the English coast, was held to have been in fault for proceeding at that rate of speed.

Upon the other hand, in the case of *The Morning Light*, 2 Wall. 550, a brig running through Buzzard's Bay in a dark and rainy night, was held not to have been in fault for not shortening sail. The court, commenting on the case of *The Virgil*, observed: " But such a restriction," as was laid down in that case, " can hardly be applied to sailing vessels proceeding on their voyage in an open sea. On the contrary, the general rule is that they may proceed on their voyage although it is dark, observing all the ordinary rules of navigation, and with

such additional care and precaution as experienced and prudent navigators usually employ under similar circumstances. They should never, under such circumstances, hazard an extraordinary press of sail, and in case of unusual darkness, it may be reasonable to require them, when navigating in a narrow pathway where they are liable to meet other vessels, to shorten sail if the wind and weather will permit." The actual speed of the Morning Light is not given, although the wind seems to have been blowing a five to six-knot breeze, which would indicate a somewhat lower rate of speed than in this case. In the case of *The Itinerant*, 2 W. Rob. 236, decided in 1844, Dr. Lushington was of opinion that it was the duty of the shipmaster, whether in a dense fog or great darkness, to exercise the greatest vigilance and to put his vessel under command, although such precautions might occasion delay in the prosecution of the voyage. "It may be," said he, "that for such a purpose it would be his duty to take in his studding sails; but such is the constantly varying combination of circumstances arising from locality, wind, tide, number of vessels in the track and other considerations, that the court cannot venture to lay down any general rule which would absolutely apply in all cases." So, too, in *The Pepperell*, Swabey, 12, Dr. Lushington held a ship proceeding in the North Sea at the rate of six and one-half knots an hour during a night so dark that vessels could only be seen at a distance of 100 to 200 yards, was in fault if she knew, or ought to have known, that she was crossing a fishing ground. See, also, *The Lord Saumarez*, 6 Notes of Cases, 600; *The Juliet Erskine*, Ibid. 633.

These cases were all decided before the new steering and sailing rules, which were first adopted in 1863 by a British Order in Council, and in 1864 by an act of Congress. The twenty-first of these rules, as they appear in the Revised Statutes, section 4233, requires that "every steam vessel shall, when in a fog, go at a moderate speed." No mention is made in this rule of sailing vessels, but the courts, both in England and America, so far as they have spoken upon the subject, have adhered to the rule laid down in the earlier cases above cited — that rates

of speed which would be considered immoderate for steamers are open to like condemnation in the case of sailing vessels. See discussion in *The Chancellor*, 4 Ben. 153, 160. In *The Thomas Martin*, 3 Blatchford, 517, a schooner was condemned by Mr. Justice Nelson for racing on a night which was not unusually dark, yet was so overcast and cloudy that a vessel without lights could not be seen at a distance exceeding a half mile. The schooner had all her sails set, with a pretty fresh wind, and was running at a rate of speed that, under the circumstances, he thought could not well be justified considering the character of the night.

In the case of *The Johns Hopkins*, 13 Fed. Rep. 185, it was held by Mr. Justice Harlan and Judge Lowell that, in case of a fog and in a place much frequented by vessels, it was as much the duty of a sailing vessel to go at a moderate rate of speed as it was the duty of a steamer. In this case a brig, sailing with the wind nearly aft and making eight to nine knots through the water, with a current of two knots in her favor, off the coast of Cape Cod, was held to have been in fault for a collision with a steamer in a dense fog. So in *The Wyanoke*, 40 Fed. Rep. 702, it was held by Judge Brown, of the Southern District of New York, that a schooner having nearly all her canvas set and running in a dense fog off Cape May at a speed of six knots an hour, was not going at the moderate speed required by law. In *The Attila*, Cook's Cas. 196, the Vice Admiralty Court at Quebec condemned a sailing vessel for running at a speed of six or seven miles an hour, in a dense fog in the fairway from the Atlantic Ocean, between Cape Ray and St. Paul's Island into the Gulf and the lower waters of the St. Lawrence River, although there was abundance of evidence that this was the customary rate of speed during a fog in this locality.

In 1879 a new code was adopted in England, and in 1885 in this country, article 13 of which provides that "every ship, *whether a sailing ship or steamship* shall, in a fog, mist or falling snow, go at a moderate speed."

In the case of *The Elysia*, 4 Asp. Mar. Law Cas. (N. S.) 540, 544, it was held by the Admiralty Court and by the Court of

Appeal in England, that a speed of five knots in the case. cf a sailing ship out in the Atlantic Ocean in a fog, is a moderate speed, although at the time she was under all plain sail and going as fast as she could with the wind on her quarter. Lord Justice Brett was of opinion .that a moderate speed was not absolutely the same with regard to a steamer as to a sailing vessel. "If you were to say that three knots were a moderate speed for a steamer in which to turn from one point to another when out in the ocean, that does not presume that that would be a moderate speed for a sailing vessel, because a steamer can reduce her speed to a knot and a half. It would, however, be very dangerous for a sailing vessel, under all circumstances, to reduce her speed to anything like three knots, because such a speed would, in certain circumstances, place her entirely out of command."

In *The Zadok*, L. R. 9 P. D. 114, which was a collision between a steamship and a barque in the English Channel, it was held to have been the duty of the barque to reduce her speed so far as she could consistently with keeping steerageway, and as it was shown that she was carrying nearly all her canvas and proceeding at a speed of more than four knots an hour, she was held to be in fault and the steamer exonerated. A like ruling was made by the Master of Rolls, speaking for the Court of Appeal in *The Beta*, L. R. 9 P. D. 134. The collision took place in a dense fog in the Bristol Channel, and it was held that a vessel must not go faster than would enable her to be kept under command.

In the case of *The N. Strong*, (1892) L. R. P. D. 105, which was a collision in the English Channel, it was held that a sailing vessel which was making about four knots an hour in a fog, was not proceeding at a rate of speed beyond what was necessary to keep her well under command.

The cases in the American courts are of the same purport. In *The Rhode Island*, 17 Fed. Rep. 554, it was held by Judge Brown of the Southern District of New York, that a speed .of seven knots an hour in a foggy evening in Long Island Sound was not a moderate rate of speed, although the twenty-first rule did not apply in terms to sailing vessels.

No absolute rule can be extracted from these cases. So much depends upon the density of fog and the chance of meeting other vessels in the neighborhood, that it is impossible to say what ought to be considered moderate speed under all circumstances. It has been said by this court, in respect to steamers, that they are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law. It is not perceived why the considerations which demand a slackening of speed on the part of steamers in foggy weather are not equally persuasive in the case of sailing vessels. The principal reason for such reduction of speed is that it will give vessels time to avoid a collision after coming in sight of each other. If two steam vessels are approaching upon converging courses at a combined rate of speed of thirty miles an hour, and are only able to see each other three or four lengths off, it would be practically impossible to avert a collision; whereas, if each were going at the lowest rate of speed consistent with good steerageway, a collision might easily be avoided by stopping and reversing their engines, or by a quick turn of the wheel and an order to go ahead at full speed. While sailing vessels have the right of way as against steamers, they are bound not to embarrass the latter, either by changing their course or by such a rate of speed as will prevent the latter from avoiding them. There is also the contingency that a schooner sailing with the wind free, as in this case, may meet a vessel closehauled, in which case the latter has the right of way, and the former is bound to avoid her. Beyond this, however, a steamer usually relies for her keeping clear of a sailing vessel in a fog upon her ability to stop and reverse her engines; whereas, it is impossible for a sailing vessel to reduce her speed or stop her headway without manœuvres which would be utterly impossible after the two vessels come in sight of each other. Indeed she can do practically nothing beyond putting her helm up or down to "ease the blow" after the danger of collision has become imminent. The very fact that a sailing vessel can do

so little by manœuvring is a strong reason for so moderating her speed as to furnish effective aid to an approaching steamer charged with the duty of avoiding her.

In this case the Golden Rule, though not pursuing the most frequented path of coastwise commerce, was sailing through waters where other vessels were frequently met, and not far from the usual track of transatlantic steamers. Her foghorn was heard by the steamer but once, or possibly twice, while if the vessels had been proceeding at the speed required by law, their signals would have been exchanged so many times that the locality and course of each would have been clearly made known to the other. In other words, sufficient time would have been given for the steamer to have taken the proper steps to avoid the schooner. Upon the whole, we are of opinion that the courts below were right in condemning the schooner for immoderate speed.

2. An important question of damages remains to be considered. Libellants, as bailees for the owners of the cargo, proceeded against and were held entitled to recover of the steamship the entire value of the cargo, but the latter was allowed to recoup one half of this amount from one half the amount of damages suffered by the schooner. This appears to have been done upon the authority of *The North Star*, 106 U. S. 17, in which it was held that, where a collision occurred through the mutual fault of two vessels, one of which was sunk and the other of which was damaged, the owners of the sunken vessel were not entitled under the Limited Liability Act to an entire exoneration from liability, but that the damage done to both vessels should have been added together in one sum, and equally divided, and a decree should have been pronounced in favor of the vessel which suffered most against the one which suffered least, for half the difference between the amounts of their respective losses. A similar ruling was made in *The Manitoba*, 122 U. S. 97, and in *The Stoomvaart Maatschappy Nederland* v. *Pen. & Or. Steam Nav. Co.*, 7 App. Cas. 795.

But libellants insist in this connection that the act of February 13, 1893, known as the Harter Act, has modified the

previous existing relations between the vessel and her cargo, and has an important bearing upon this branch of the case. By the third section of that act, the owner of a seaworthy vessel (and, in the absence of proof to the contrary, a vessel will be presumed to be seaworthy) is no longer responsible to the cargo for damage or loss resulting from faults or errors in navigation or management. This section is made applicable to "any vessel transporting merchandise or property to or from any port in the United States;" and we know of no reason why a foreign vessel like the Golden Rule, engaged in carrying a cargo from a foreign port to Boston, is not entitled to the benefit of this provision. Had the cargo of the schooner arrived at Boston in a damaged condition, it is clear that the vessel might have pleaded the statute in exoneration of her liability, if the damage had occurred through a fault or error in navigation, such, for instance, as a collision due wholly or partly to her own fault. So, if a vessel and cargo be totally lost by such fault, we know of no reason why the owner of the vessel is not entitled to the benefit of this section, as well as to his exemption under the Limited Liability Act.

The reasons which influenced this court to hold in the case of *The Scotland*, 105 U. S. 24, that the Limited Liability Act applied to owners of foreign as well as domestic vessels, and to acts done on the high seas, as well as in the waters of the United States, apply with even greater cogency to this act. "In administering justice," said Mr. Justice Bradley, p. 29, "between parties, it is essential to know by what law, or code, or system of laws, their mutual rights are to be determined. When they arise in a particular country or State, they are generally to be determined by the law of that State. Those laws pervade all transactions which take place where they prevail, and give them their color and legal effect. . . . But, if a collision occurs on the high seas, where the law of no particular State has exclusive force, but all are equal, any forum called upon to settle the rights of the parties would *prima facie* determine them by its own law, as presumptively expressing the rules of justice; . . . . if it

be the legislative will that any particular privilege should be enjoyed by its own citizens alone, express provision will be made to that effect. . . . But the great mass of the laws are, or are intended to be, expressive of the rules of justice, and are applicable alike to all. . . . But there is no demand for such a narrow construction of our statute," (as was given by the English courts to their Limited Liability Act,) "at least to that part of it which prescribes the general rule of limited responsibility of shipowners. And public policy, in our view, requires that the rules of maritime law as accepted by the United States should apply to all alike, as far as it can properly be done. If there are any specific provisions of our law which cannot be applied to foreigners, or foreign ships, they are not such as interfere with the operation of the general rule of limited responsibility. That rule and the mode of enforcing it are equally applicable to all. They are not restricted by the terms of the statute to any nationality or domicil. We think they should not be restricted by construction." It will be observed that the language of the Harter Act is more specific in its definition of the vessels to which it is applicable, than the Limited Liability Act, which simply uses the words "any vessel," whereas, by the third section of the Harter Act, it is confined to "any vessel transporting merchandise or property to or from any port in the United States." Where Congress has thus defined the vessels to which the act shall apply, we have no right to narrow the definition. It may work injustice in particular cases where the exemptions are accorded to vessels of foreign nations which have no corresponding law, but this is not a matter within the purview of the courts. It is not improbable that similar provisions may ultimately be incorporated in the general law maritime. Indeed, the act has been already held by this court applicable to foreign as well as to domestic vessels. *The Silvia,* 171 U. S. 462. See also *The Etona,* 64 Fed. Rep. 880; *The Silvia,* 68 Fed. Rep. 230.

Assuming then that the Harter Act applies to foreign vessels, we are next to inquire into its effect upon the division of damages in this case. It was held by this court in the

case of *The Atlas*, 93 U. S. 302, that an innocent owner of a cargo is not bound to pursue both colliding vessels, though both may be in fault, but is entitled to a decree against one alone for the entire amount of his damages. It was held by the courts below that, while the action by the owner of the cargo would lie against the steamer for the whole amount of damage done, the owners of such steamer were entitled to recoup one half of this amount against one-half of the amount awarded to the owners of the schooner for the loss of their vessel, upon the theory that, under the Limited Liability Act, they were liable for one half this amount, not exceeding the value of the schooner. But libellants insist that as the third section of the Harter Act declares that the owners of a seaworthy vessel shall not be liable in any amount for damage or loss resulting from a fault or error in navigation, the owners of the schooner are entitled to this exoneration, whether the action be directly against the vessel by the owner of the cargo, or by a third party, who is claiming the rights to which he is entitled, and who for that purpose is standing in his shoes. That the exemptions of the act are not intended for the benefit of the steamship or any other vessel, by whose negligence a collision has occurred, but for the benefit of the carrying vessel alone; and if she be held liable in this indirect manner for a moiety of the damages suffered by the cargo, the act is to that extent disregarded and nullified. That the amount which is paid by recoupment from the just claim of the schooner against the steamship is paid as effectually as it would be by a direct action by the owners of the cargo against the schooner; and while in this case it works an apparent hardship upon the steamer, (a hardship more apparent than real, owing to the greater fault of the steamer,) it does not in reality extend her liability, but merely prevents her taking advantage of a deduction to which without the act she might have been entitled.

But the majority of the court are of opinion that the principles announced by us in *The North Star*, 106 U. S. 17; *The Manitoba*, 122 U. S. 97; *The Delaware*, 161 U. S. 459; and *The Irrawaddy*, 171 U. S. 187, are equally applicable here.

The case of the *North Star* is especially pertinent. That case arose from a collision between two steamships, one of which, the *Ella Warley*, went to the bottom, while the other was considerably damaged. The suit was tried upon libel and cross-libel, both vessels found in fault, and the damages ordered to be divided. No question arose with regard to the cargo, but the owners of the *Ella Warley* raised a question as to the amount of their recovery under the Limited Liability Act, which provides (Rev. Stat. § 4283) that "the liability of the owner of any vessel . . . for any loss, damage or injury by collision . . . occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." It seems that, if the vessel be totally lost, the liability of her owner is thereby extinguished. *Norwich Company* v. *Wright*, 13 Wall. 104. The owners of the Ella Warley sought to apply this rule to a case of mutual fault, and contended that, as their vessel was a total loss, the owners were not liable to the *North Star* at all, not even to have the balance of damage struck between the two vessels; but that half of their damage must be paid in full without deduction of half the damage sustained by the *North Star*. But the court held "that where both vessels are in fault, they must bear the damage in equal parts; the one suffering the least being decreed to pay to the other the amount necessary to make them equal, which amount, of course, is one half of the difference between the respective losses sustained. When this resulting liability of one party to the other has been ascertained, then, and not before, would seem to be the proper time to apply the rule of limited responsibility, if the party decreed to pay is entitled to it. It will enable him to avoid payment *pro tanto* of the balance found against him. In this case the duty of payment fell upon the *North Star*, the owners of which have not set up any claim to a limit of responsibility. This, as it seems to us, ends the matter. There is no room for the operation of the rule. The contrary view is based on the idea that, theoretically, (supposing both vessels in fault,) the owners of the one are liable to

the owners of the other for one half of the damage sustained by the latter; and, *vice versa*, that the owners of the latter are liable to those of the former for one half of the damage sustained by her. This, it seems to us, is not a true account of the legal relations of the parties. It is never so expressed in the books on maritime law. . . . These authorities conclusively show that, according to the general maritime law, in cases of collision occurring by the fault of both parties, the entire damage to both ships is added together in one common mass and equally divided between them, and thereupon arises a liability of one party to pay the other such sum as is necessary to equalize the burden. This is the rule of mutual liability between the parties."

In delivering the opinion Mr. Justice Bradley cited and disapproved of the case of *Chapman* v. *Royal Netherlands Navigation Co.*, L. R. 4 P. D. 157, which was much relied upon by counsel for the Ella Warley. It is interesting to note that this case was overruled by the House of Lords three months before the opinion in the *North Star* was delivered, in the case of the *Stoomvart Maatschappy Nederland* v. *The Peninsular and Oriental Steam Navigation Co.*, L. R. 7 App. Cas. 795, and the rule laid down in the *North Star* adopted. The same rule was subsequently applied in *The Manitoba*, 122 U. S. 97.

The other cases are not directly in point, but their tendency is in the same direction. In that of *The Delaware*, 161 U. S. 459, it was said that the whole object of the Harter Act was to modify the relations previously existing between the vessel and her cargo, and that it had no application to a collision between two vessels. In *The Irrawaddy*, 171 U. S. 187, it was held that, if a vessel be stranded by the negligence of her master, the owner had not the right, under the Harter Act, to a general average contribution for sacrifices made and suffered by him subsequent to the stranding, in successful efforts to save the vessel, freight and cargo.

But if the doctrine of the *North Star* be a sound one, that in cases of mutual fault the owner of a vessel which has been totally lost by collision is not entitled to the benefit of an act limiting his liability to the other vessel until after the balance

of damage has been struck, it would' seem to follow that the sunken vessel is not entitled to the benefit of any statute tending to lessen its liability to the other vessel, or to an increase of the burden of such other vessel, until the amount of such liability has been fixed upon the principle of an equal division of damages. This is in effect extending the doctrine of the *Delaware case,* wherein the question of liability for the loss of the cargo was not in issue, to one where the vessel suffering the greater injury is also the carrier of a cargo — in other words, if the Harter Act was not intended to increase the liability of one vessel toward the other in a collision case, the relations of the two colliding vessels to each other remain unaffected by this act, notwithstanding one or both of such vessels be laden with a cargo.

We are therefore of opinion that the Court of Appeals did not err in deducting half the value of the cargo from half the value of the sunken schooner, and in limiting a recovery to the difference between these values. The decree is

*Affirmed.*

The CHIEF JUSTICE and MR. JUSTICE PECKHAM dissented.