## PORTEL v. UNITED STATES et al.

United States District Court
S. D. New York.
Feb. 7, 1949.

William H. Ross, New York City, for libellant. Jacob Rassner, New York City, of counsel.

John F. X. McGohey, United States Attorney, New York City, for the United States, by Irving L. Evans, New York City, of counsel.

John P. Smith, New York City, for respondent impleaded. Albert S. Commette, New York City, of counsel.

KAUFMAN, District Judge.

This is a suit in admiralty brought under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq. Libellant, an employee of Zalud Marine Corporation, sues the United States of America for personal injuries alleging that it failed to furnish him with a safe place to work. The United States answered and impleaded Zalud Marine, claiming the accident was caused solely by the latter's negligence and, in any event, that the United States is entitled to indemnity or contribution. By stipulation the question of indemnity in so far as it arises under the terms of a written contract between the United States and Zalud Marine, has been withdrawn.

At the conclusion of the trial, I dictated a memorandum on the record, of which the following is a part:

"The Court: I think it would be very helpful if that were done at this time. I will tentatively make some observations in this case, and I am prepared to do it now.

"It seems to me from the evidence in this case, particularly from the evidence of Mr. Smythe and Mr. Stafford, that the owners of the vessel, if they were under a duty in law to provide a safe place for business guests to work in, failed in that duty.

"I am inclined to feel also that the Zalud Marine Corporation, the contractor through its foreman, Mr. Reichert, whose testimony I have read, had been reckless in permitting men to go to work under the circumstances narrated here, with the meagre investigation that he made, if any, and I do not credit, in the light of all the facts in this case, his testimony that he was advised that the starboard boiler had been put

out eight to ten hours prior to the time when he ordered his men to work.

"I find also that the libelant by his actions contributed largely to the happening of this accident. I do not quite understand his testimony to the effect that after he slackened up the nuts and took them out that he kicked this bonnet, but under the law as I understand it, contributory negligence is not a defense but merely goes to the minimization of damages.

"Tentatively those are going to be my findings in this case.

"I have given no consideration up to this time, and I should like to have help from counsel for both respondents, on the question of liability over.

\* \* \* \* \* \*

"I would like to have the benefit of a brief from you on the extent of minimization of such damages as the libelant may be entitled to by reason of his contributory negligence, I might as well state here and now that as to the extent of the damages sustained by the libelant:

"I will find that the libelant sustained serious injuries; that they consisted of first, second and third degree burns, which covered from 30 to 40 per cent of his body, including his genital organs.

"I will find that the libelant endured very great and serious pain and suffering for a period of approximately six weeks, three weeks beyond the 23 days that he was in the hospital.

"I will find that he has made an excellent recovery, although at the present time he has a number of disfiguring marks on his body, and that his face and ears have healed up completely.

"I will find that the libelant has lost approximately $650 in earnings. I will find that the libelant has not had any medical bills. I will find that the libelant is entitled to recover damages for his loss of earnings, plus compensation for his tremendous pain and suffering during the six-weeks' period, and in addition, some compensation for the disfiguring marks on his body which are permanent, less such amount as must be deducted by reason of his contribution to the cause of this accident.

"I will find that the libelant has totally failed to sustain the burden of establishing that the impotency either exists or that it was a result of the accident, if it does exist. I have very serious doubt as to the existence of impotency. I predicate that finding on the impression made on me by the libelant and his wife during the course of their testimony."

Counsel have submitted findings of fact and conclusions of law which I find only to the extent as herein indicated.

### Findings of Fact

1. At all times herein material, the respondent was the operating owner of a Liberty type merchant vessel, known as the S. S. Kavanaugh; which vessel had not been taken out of navigation, was on the navigable waters of the United States and was manned with officers and crew, including a chief as well as assistant engineers.

2. Prior to August 18, 1944, the respondent entered into a contract with the respondent-impleaded for certain repairs aboard the vessel, including the overhauling and repair of various valves in the engine room, pursuant to certain written specifications.

3. On August 16, 1944 at 4:00 P.M., the S. S. Kavanaugh arrived at and was berthed at an open pier in the Hudson River, on the Manhattan side thereof in the vicinity of 134th Street.

4. Upon berthing, the port boiler of the vessel was immediately shut down.

5. Steam was maintained by the crew of the vessel on the remaining boiler, the starboard boiler, on and through August 17, 1944.

6. On August 17, 1944 workmen employed by the respondent-impleaded were engaged in cleaning out the port boiler.

7. On August 18, 1944, between 7:00 and 7:30 A.M., the Night Engineer was relieved by the Third Assistant Engineer.

8. On August 18, 1944, between 7:30 and 8:00 A.M., the Third Assistant Engineer, pursuant to orders of the Assistant Port Engineer, shut down the starboard boiler by extinguishing the fires and closing the

stop valves. He then went on deck and remained there until after the accident.

9. Both the Night Engineer and the Third Assistant Engineer observed employees of the respondent-impleaded in the engine-room, but did not communicate with them.

10. No one from the ship's crew opened the drains on the steam lines nor did anyone from the ship's crew make any effort to inform the employees of the contractor as to whether or not the steam lines had been drained.

11. The Chief Engineer was on board ship from about 7:30 A.M. on August 18, 1944, but he was not in the engine-room before the accident.

12. When the starboard boiler was shut down the Third Assistant Engineer as well as the Chief Engineer knew that work was to be performed on the valves by the employees of the contractor, but did not know the exact time work was to commence.

13. On August 18, 1944, some time prior to 8:00 A.M., Otto Reichert, the foreman or "snapper" for the machinists of the respondent-impleaded, came on board the vessel and proceeded to the engine-room.

14. Otto Reichert made no attempt to ascertain whether or not steam pressure was in the lines or whether or not the lines had been drained.

15. It is customary for the engineer on watch and the machinist foreman to consult each other with reference to the work and for the former to inform the latter as to whether or not it is safe to begin work on the steam lines.

16. It is not safe to begin work before the lines have been drained when there is steam pressure in the lines.

17. It is customary for both the ship's crew and the contractor to see that provision for the release of steam pressure in the lines is made before repair work on the lines is commenced.

18. At about 8:00 A.M. on August 18, 1944, Otto Reichert assigned the libellant to work on a deck machinery valve.

19. When the libellant was assigned and went to work on the valve, the lines had not been drained and there was steam pressure in the lines.

20. The libellant did not make any attempt to ascertain whether the lines had been drained or whether there was steam pressure in the lines before commencing work on the valve.

21. The libellant was a first class machinist.

22. The libellant was injured when a spray of hot water and steam gushed forth from the valve and came in contact with his body as he was attempting to lift the valve out of position.

23. The libellant did not use proper practice in removing the valve in that he failed to "bleed" the valve when he observed the pressure of steam in the lines after he commenced work on the valve.

24. The libellant sustained serious injuries consisting of first, second and third degree burns which covered from thirty to forty per cent. of his body including his genital organs, which caused impotency for a short period after the accident.

25. The libellant was confined to a hospital for twenty-three days and was bedridden and confined to his home for approximately three weeks thereafter.

26. The libellant endured tremendous pain and suffering for a period of approximately six weeks after the accident.

27. The libellant has made an excellent recovery and at present is enjoying normal health, except that he has a number of permanent disfiguring marks, primarily on his trunk and chest, as a result of the burns; and also in the region of his ankles where it was necessary to cut down on his veins when plasma had been given to him. The burns on the libellant's face and ears have healed completely.

28. The libellant has totally failed to sustain the burden of establishing that either he is, or was for some time prior to the trial, impotent or that if such impotency exists that the accident was the competent producing cause thereof.

29. The libellant incurred no medical expenses and has sought no medical attention or advice for the alleged impotency.

30. At the time of the accident, the respondent-impleaded was covered by insurance for accidents arising under the Longshoremen's and Harbor Workers' Compensation Act and subsequent to the accident the libellant filed a claim for compensation.

31. The libellant sustained special damages in the sum of $650 for loss of earnings.

32. The libellant sustained general damages in the sum of $15,000 for pain, suffering (including the temporary impotency) and permanent disfiguration.

33. The libellant contributed to the cause of the accident to the extent of twenty-five per cent.

34. The respondent and the respondent-impleaded, as between themselves, contributed to the cause of the accident in the proportion of forty per cent. attributable to the respondent, and sixty per cent. attributable to the respondent-impleaded.

## Discussion

■ The libellant was in the position of a "business guest" and as such the United States was under an affirmative obligation to furnish him with a safe place to work, Guerrini v. United States, 2 Cir., 167 F.2d 352, certiorari denied 335 U.S. 843, 69 S.Ct. 65. So long as steam pressure remained in the lines upon which work was to be done, the United States failed to carry out its duty. This omission as well as the reckless act of the foreman of Zalud Marine in ordering the libellant to work without making any inquiry as to whether steam pressure was in the lines were both proximate causes of the accident.

[3] The libellant also contributed to the cause of the accident by reason of the manner he employed in opening the valve. His actions, however, are not a bar, but only go in mitigation of damages, The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586; Guerrini v. United States, supra.

The facts herein do not entitle the United States to indemnity from Zalud-Marine (pursuant to the stipulation no consideration has been given to the question of contractual indemnity). The negligent acts of both were similar in character and both were proximate causes of the accident.

Union Stock Yds. Co. v. Chicago etc. R. R. Co., 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453; Vanderlinden v. Lorentzen, 2 Cir., 139 F.2d 995.

■ Since Zalud Marine provided the requisite compensation there can be no direct recovery against it by the libellant. Section 5, Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 905; Benevento v. United States, 2 Cir., 160 F.2d 487, 489. This immunity from direct suit, however, furnishes no defense to the United States' claim for contribution as against Zalud Marine. Rederii v. Jarka Corporation, D.C., 26 F.Supp. 304, appeal dismissed, 1 Cir., 110 F.2d 234; The Tampico, D.C., 45 F.Supp. 174; The S. S. Samovar, D.C., 72 F.Supp. 574, 588–589; Coal Operators Cas. Co. v. United States, D.C., 76 F.Supp. 681; Christon v. United States, D.C., 8 F.R.D. 327; see American Stevedores v. Porello, 330 U.S. 446, 458, 67 S.Ct. 847, 91 L.Ed. 1011. The opinion of the Court of Appeals for this Circuit in the last cited case expressly left the question open on rehearing, Sub. nom. Porello v. United States, 2 Cir., 153 F.2d 609.

■ The Longshoremen's Act only affects the rights of employers and employees; it does not affect the rights of employees against third persons nor does it change the well established admiralty rule of contribution between joint tort-feasors. The decisions under the Harter Act, 46 U.S.C.A. § 192, in a "both to blame" collision situation point the way for sustaining the United States' right to contribution in the instant case, The Chattahoochee, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801; Aktieselskabet Cuzco v. The Sucaresco, 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942.

■ Although contribution among joint tort-feasors is usually to the extent of one-half the award, the court may fix the responsibility in accordance with the proportion which the fault of each bore to the total fault. See American Stevedores v. Porello, 330 U.S. 446, 458, 67 S.Ct. 847, 91 L.Ed. 1011, and cases therein cited.

## Conclusions of Law

1. This court has jurisdiction of the parties and the subject matter of this action.

2. The respondent and the respondent-impleaded were negligent towards the libellant in that they failed to furnish him with a safe place to work, which negligence was the proximate cause of the accident.

3. The libellant was negligent in the manner he worked on the valve, which negligence contributed to the cause of the accident.

4. There can be no direct recovery by the libellant against the respondent-impleaded.

5. The respondent is not entitled to indemnity from the respondent-impleaded.

6. The respondent is entitled to contribution from the respondent-impleaded.

7. The libellant is entitled to a decree in the amount of $11,737.50 against the respondent.

8. The respondent is entitled to a decree in the amount of $7,042.50 against the respondent-impleaded.