## U. S. ORE CORPORATION
### v.
## COMMERCIAL TRANSPORT CORPORATION.
### Civ. A. No. 69–1589.

United States District Court,
E. D. Louisiana.

Jan. 18, 1974.

---

John B. Gooch, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., Hill, Rivkins, Warburton, McGowan & Carey, New York City, for plaintiff.

Donald L. King, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant.

HEEBE, Chief Judge:

This suit was brought by the U. S. Ore Corporation (hereinafter referred to as U. S. Ore), to recover for the loss of a shipment of 1,280 gross tons of manganese ore due to the sinking of defendants' barge ACBL–2584 on December 27, 1967, on the Mississippi River. By amended complaints, the American Commercial Barge Line Company, the owner of the barge, was made an additional party defendant and the cargo underwriters were made additional party plaintiffs.

The ore in question was part of a large shipment of manganese ore which U. S. Ore had purchased from Bowring & Company. U. S. Ore, in turn, had contracted to sell this ore to the Republic Steel Corporation of Cleveland, Ohio (hereinafter referred to as Republic). One of the defenses urged

upon this Court is that according to the terms of the contract between U. S. Ore and Republic, title to the ore had already passed to Republic at the time of the loss, thus precluding any recovery by U. S. Ore. The principal contract between the parties, "CONTRACT NO. 343," was accepted by Republic on December 30, 1966. (The ore in question was actually sold pursuant to an appendix to this contract which incorporated all of its terms and conditions.) It provides in pertinent part:

"4. DELIVERY: The material shall be delivered at Burnside, Louisiana or Contracoeur, Canada, as designated by the Buyer prior to chartering of the ocean-going vessel, in accordance with the shipment clause hereof, *and title shall pass to Buyer at the port of discharge F.O.B. river barges* or ground storage at Burnside, Louisiana and/or Great Lakes Carrier or ground storage at. Contracoeur, Canada, at Buyer's option. Transportation beyond the port of discharge shall be provided by Buyer." (emphasis added)

U. S. Ore contends that a letter dated December 12, 1967, from Donald Brickell, its vice-president in charge of handling ore shipments, to M. L. Grier of Republic, evidences a modification of this contractual provision insofar as the shipment in question is concerned. The letter, referring to a prior telephone conversation between the two during which certain changes were apparently agreed to, reads as follows:

December 12, 1967

"Mr. M. L. Grier
Republic Steel Corporation
Republic Building
Cleveland, Ohio

"Dear Mr. Grier:

"This will refer to our recent telephone conversation in which we advised we had chartered vessels to lift the balance of about 45,000 Tons of Manganese Ore now due you. The first of these vessels, to be delivered under Appendix to Contract No. 343 dated November 4, 1966. (sic)

"The SS 'BUENA FORTUNA' now afloat and due at Burnside, Louisiana, during the week of December 18, 1967, with about 14,500 Long Tons of Grand Lahou Manganese Ore 'GLA.' The freight rate on this vessel is $5.50 per Long Ton.

"Arrangements have been concluded with Union Carbide Corporation to ship this material by barges to Marietta, Ohio, *where title will pass to you upon its arrival in January 1968.* We have made arrangements with U.C.C. to have the barge freight invoices forwarded to us for payment and we have insured the cargo under our open Marine Policy covering the river movement.

"As agreed, you will be billed for this shipment in January 1968 with three months terms thus providing for payment in April as you requested.

Very truly yours,
U. S. Ore Corporation
D. Brickell
Vice President"

(emphasis added)

The change in terms was agreed to so as to delay the transfer to Republic's inventory until after January 1, 1968. Defendants argue that this modification is ineffective because "there has been no showing of authority on the part of Mr. Brickell to amend this contract in the telephone conversation, and of course oral evidence is not admissible to change the written contract in question." (Memorandum of defendants, p. 5) We find, however, that Mr. Brickell clearly had authority to amend the contract on behalf of U. S. Ore. He was, after all, a vice-president of the company responsible for handling ore shipments. Further, we note that oral evidence is admissible to show that the parties to a written contract subsequently agreed to a change in its terms. But even if such evidence were not admissible, the Court has before it more than mere oral evidence of a contract modification; the

letter of December 12, 1967, stands as clear, written evidence that the parties agreed to a change in the terms governing the shipment in question.

▉ We must next determine whether this modification was legally effective. The original contract between U. S. Ore and Republic contained a provision that "This agreement shall be construed in accordance with the laws of the State of New York." The Court finds that under N.Y. Uniform Commercial Code § 2–209(1) the parties executed an enforceable modifying agreement and that consequently U. S. Ore had title to the ore during the time it was in transport to Marietta, Ohio.

Pursuant to the modified terms of its contract with Republic, Mr. Brickell of U. S. Ore contacted Mr. Joseph Honan in Union Carbide's traffic department and arranged for Union Carbide to provide for barge transportation of the ore from Burnside, Louisiana to Marietta, Ohio. Union Carbide customarily made such arrangements for Republic, often employing the services of defendant Commercial Transport Corporation (hereinafter referred to as Commercial), which supplied the necessary barges. Commercial contends that a binding contract existed with Union Carbide governing the shipment in question which insulates Commercial from liability for the loss of the ore. U. S. Ore, on the other hand, questions the enforceability of the contract and, in any event, disputes its binding effect upon it, a stranger to the agreement.

The disputed contract, dated February 17, 1967, was drafted by Thomas Frazier, III, Commercial's Director of Dry Bulk Cargo Sales and was addressed to Mr. Honan of Union Carbide. According to this letter-contract, Commercial agreed to furnish Union Carbide with sufficient barges to handle up to 150,000 gross tons per year at a maximum rate of 20,000 gross tons per month, and Union Carbide agreed to offer to Commercial a certain percentage of the tonnage in each vessel arriving at a Gulf port for discharge to river barges up to a maximum of 20,000 gross tons per month. Further details of the agreement are spelled out in the twelve paragraphs which follow, covering such topics as the "freight rate" ($2.70 per gross ton from vessel), the equipment to be furnished and "freetime and demurrage." Paragraph 10 is of special interest and reads as follows:

> "10. RELEASE: Carbide agrees to release and hold harmless Commercial, or any contractor or agent of Commercial's, from any and all liability, except through general average of hull interest only, for any damage or damage to cargo, and if Carbide elects to insure or self-insure cargo, Commercial shall be named as an additional assured with waiver of subrogation against Commercial or any contractor or agent of Commercial's."

Commercial, of course, seeks to avoid liability on the basis of this provision. U. S. Ore, on the other hand, directs the Court's attention to paragraph 6 and the last sentence of the agreement.

> "6. EFFECTIVE DATE: This agreement will become effective when signed (as evidenced by return to Commercial of one signed copy of this agreement) and will remain in effect until March 31, 1968 . . . ."

The last sentence states "If the foregoing meets with your approval, please signify your acceptance by signing in the space provided below and returning one copy to us for our files."

It is undisputed that Union Carbide never signed and returned a copy of this agreement to Commercial. It is U. S. Ore's position that Union Carbide's failure to sign and return a copy destroyed the validity of this agreement. Therefore, U. S. Ore asks us to disregard that contract and find instead that an implied contract of affreightment resulted, governed by the principles of general maritime law. We disagree and find that notwithstanding Union Carbide's failure to sign and return a copy of the February 17, 1967 contract, that

796

document was legally binding upon Union Carbide and Commercial.

While it is true that under general principles of contract law, an offeror may prescribe the manner in which acceptance of his offer shall be indicated by the offeree, it is also true that if the offeror merely suggests a permitted method of acceptance, other methods of acceptance are not precluded. Restatement, Contracts, Sec. 61; Williston on Contracts, Third Ed., Secs. 70, 76. Furthermore, it is well settled that if the offeree fails to comply with the requested method of acceptance, but actually tenders the requested performance pursuant to the terms of the agreement, the performance itself acts as an acceptance, thereby binding the parties to the contract. Restatement, Contracts, Sec. 63; Williston on Contracts, Third Ed., Secs. 75, 78A.

Turning to the facts of this case, we find that the parties did not intend paragraph 6 to prescribe the sole method of acceptance. To be sure, signing and returning a copy of the agreement would have immediately bound the parties to its terms, but paragraph 6 does not preclude other indicia of acceptance. We agree with the decision in Allied Steel and Conveyors, Inc. v. Ford Motor Company, 277 F.2d 907 (6th Cir. 1960), in which the court held that the following provision was not intended to prescribe an exclusive mode of acceptance:

"This purchase order agreement is not binding until accepted. Acceptance should be executed on acknowledgment copy which should be returned to buyer."

See also, Durasteel Co. v. Great Lakes Steel Corp., 205 F.2d 438 (8th Cir. 1953). Our conclusion in this respect is buttressed by the fact that Mr. Frazier had in the past mailed similar documents to Union Carbide pertaining to the movement of bulk cargo without ever receiving a signed copy in return. Yet, the two parties considered themselves bound by the terms therein set forth. Because of this past course of dealing, it is clear that literal compliance with paragraph 6 was not considered to be crucial.

Commercial's offer of February 17, 1967, was accepted and a binding contract effected when the parties commenced to perform in accordance with the terms of the agreement. "It is well settled that acceptance of an offer by part performance in accordance with the terms of the offer is sufficient to complete the contract." Allied Steel, supra, 277 F.2d at 911. It is difficult to determine from the evidence precisely when performance began but it is clear that the shipment in question was intended to be governed by the February 17, 1967 agreement. The freight rate charged was the same as specified in that document. Free time and demurrage were calculated in accordance with that agreement.

Furthermore, immediately following the loss of the cargo, Mr. Brickell asked Mr. Honan for some documentation of the terms of Union Carbide's agreement with Commercial. He was furnished with a copy of the February 17, 1967 agreement. And in a letter dated April 29, 1968 to Bowring and Company (from whom U. S. Ore had purchased the ore) Mr. Brickell admits that "Union Carbide ordered the barges on their usual terms and conditions." We are clearly convinced that the agreement of February 17, 1967 was accepted by Union Carbide's performance according to its terms and that this form of acceptance was assented to by Commercial. Allied Steel, supra; Durasteel, supra; Local Joint Exec. Bd. v. Nationwide Downtowner Motor Inns, 229 F.Supp. 413 (W.D.Mo.1964). Hence, the February 17, 1967 agreement constituted a legally binding contract between the parties.

Our so holding is, of course, fatal to U. S. Ore's cause. U. S. Ore having title to the ore, caused Union Carbide to arrange for the barges to transport it to Marietta, Ohio. There is, therefore, little doubt that Union Carbide acted as U. S. Ore's agent in this matter and

bound U. S. Ore to the terms of the above-mentioned contract with Commercial. In addition, the bill of lading covering the shipment in question, on which U. S. Ore appears as shipper and Union Carbide as consignee states:

"CONTRACT TERMS AND CONDITIONS

"The freight referred to on the reverse side of this Bill of Lading is transported pursuant to all terms and conditions of a Contract that has been agreed to by all parties."

The contract referred to is clearly the one of February 17, 1967. Thus, U. S. Ore was put on notice that a contract existed which would govern the transportation of the ore upriver. There is a conflict in the evidence as to whether U. S. Ore had actual knowledge of the terms of the February 17, 1967 contract but this question is immaterial. In making the barge arrangements, Union Carbide was acting on U. S. Ore's behalf with U. S. Ore's full authority. U. S. Ore cannot now protest that it was not bound by the contractual arrangements which existed between Union Carbide and Commercial. If U. S. Ore was not informed as to the specifics of such arrangements, it should have taken the trouble to find out.

Therefore, we find that paragraph 10 of the February 17, 1967 contract is legally binding upon U. S. Ore and its underwriters and constitutes a bar to the plaintiffs' claims. That paragraph explicitly provides for waiver of subrogation against Commercial and for Commercial to be released and held harmless from any and all liability. The enforceability of this particular contractual provision is not questioned by U. S. Ore; we note that in a private contract of affreightment such contractual limitations on liability are, indeed, valid. *See,* Calcasieu Chemical Corporation v. Canal Barge Company, 404 F. 2d 1227 (7th Cir. 1969); Tenneco Oil Co. v. Tug Tony, 324 F.Supp. 834 (S.D.Tex. 1971); Pure Oil Company v. M/V Caribbean, 235 F.Supp. 299 (W.D.La.1964).

Because paragraph 10 defeats the plaintiffs' cause, we need not reach the other issues presented by this suit. Accordingly,

It is the order of the Court that judgment be entered in favor of the defendants.