ALAMO CHEMICAL TRANS-
PORTATION CO.

v.

M/V OVERSEAS VALDES, her engines,
furniture, apparel, tackle, etc., in rem,
and Maritime Overseas Co., in person-
am.

Civ. A. No. 72–827.

United States District Court,
E. D. Louisiana.

April 12, 1979.

George A. Frilot, III, Lemle, Kelleher, Kohlmeyer & Matthews, Cornelius G. Van Dalen, Deutsch, Kerrigan & Stiles, George

H. Troxell, III, New Orleans, La., for plaintiff.

James B. Kemp, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., Max Taylor, Burke & Parsons, New York City, J. Dwight LeBlanc, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK M. GORDON, District Judge.

On March 17, 1972, a collision occurred between the M/V OVERSEAS VALDES and the Tug HARD WORK and its tow, the Barge SUN–CHEM 900. Alamo Chemical Transportation Co. (hereinafter referred to as "Alamo"), the owner of the Tug HARD WORK, commenced this action, *in rem*, against the M/V OVERSEAS VALDES and *in personam* against the Maritime Overseas Co. (hereinafter referred to as "Maritime").

Maritime, the operator of the M/V OVERSEAS VALDES, answered Alamo's complaint and counterclaimed against Alamo, *in personam*, and the Tug HARD WORK, *in rem*, seeking damages suffered in the collision by the M/V OVERSEAS VALDES. Firestone Tire & Rubber Company, the owner of the cargo stowed in the Barge SUN–CHEM 900, intervened to recover for the damage to the cargo. Firestone Tire & Rubber Company (hereinafter referred to as "Firestone") intervened against the Tug HARD WORK, *in rem*, and Alamo, *in personam*, the M/V OVERSEAS, *in rem*, and Maritime, *in personam*. Maritime then counterclaimed against Alamo for recovery over against Alamo if Maritime is found liable to Firestone. Alamo cross-claimed against Maritime for recovery if Alamo is found liable to Firestone. Alamo filed a third party complaint against Texas Chemical Plastic Corporation (hereinafter referred to as "Texas"). Alamo had contracted with Texas to provide transportation for shipments of chemicals. Alamo also claims that if it is found liable to Firestone for damage to the cargo, then

Alamo is entitled to contractual indemnity from Texas.

Counsel for the various parties requested that the issue of liability be submitted to the Court on consideration of the depositions of Mr. Merlin A. McKee, Mr. Gerald K. Moore, Mr. John W. Ward and Mr. Daniel H. West. On July 24, 1975, the Court entered its findings of facts and conclusions of law wherein it determined that liability for this collision should be assigned at 20% to the M/V OVERSEAS VALDES and 80% to the Tug HARD WORK.

The remaining issues have been submitted to the Court on depositions and briefs. Inasmuch as fault has been determined, the only questions that remain unresolved, and capable of resolution, relate to the contractual relationships between the parties and the form of the judgment.[1]

After analyzing the depositions of Mr. Charles William Baeder, Jr., Mr. Gordon Gauthier, and Mrs. Patricia A. Berman; the several depositions submitted on the liability issue; the proposed findings of facts and conclusions of law; the various memoranda and reply memoranda of counsel; and the exhibits, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1.

Texas and Firestone entered into a five year contract, commencing January 1, 1972, for the sale and delivery of liquid styrene monomer, hereinafter referred to as "styrene." According to Gordon Gauthier, the Comptroller of Firestone's Synthetic Rubber and Latex Division in Lake Charles, Louisiana, this contract governed the shipment of 10,042 barrels of styrene laden aboard the Barge SUN–CHEM 900 on March 17, 1972. Under this contract Firestone retained the option of specifying whether a particular delivery was to be transported by tank truck, tank car, or barge. Texas was expressly obligated to furnish transportation if Firestone elected delivery by tank car or tank truck. Texas was not responsible for furnishing barge transportation. Through its Vice President, Mr. Shockey, Firestone requested that Texas arrange barge transportation for the March 17, 1972 shipment of styrene. Texas agreed.

### 2.

Firestone became the owner of the styrene at the producer's plant of origin.[2] As specified in the Firestone Purchase Order No. 72–285, the March 17, 1972 shipment of styrene was purchased from Texas in accordance with the Firestone-Texas contract.

### 3.

On January 19, 1972, Texas and Alamo entered into a contract, captioned Barge Charter Party, for one or more trips from either Houston, Texas, or Donaldsonville, Louisiana, to the Firestone Rubber Company in Lake Charles, Louisiana. The freight rate to be paid by the charterer was $1.33 per short ton from Houston, Texas, and $1.80 per short ton from Donaldsonville, Louisiana. Although Texas was the named charterer in the Barge Charter Party, Firestone actually paid the freight.[3]

### 4.

The inspection of the Barge SUN–CHEM 900 laden with Firestone's cargo of styrene was performed by Saybolt, Inc. The cost of

1. Having scrutinized the record, the Court has been unable to uncover any evidence pertaining to the issue of quantum concerning the M/V OVERSEAS VALDES, the Tug HARD WORK and its tow, the Barge SUN–CHEM 900. Neither has this issue been briefed. Accordingly, the Court concludes that this issue has been abandoned.

2. Clause 7 of the Firestone-Texas contract and Gordon Gauthier dep. pp. 10 and 35.

3. Gordon Gauthier dep. p. 26; exhibit marked F–6B; and exhibit marked Texas Chem. Berman # 3. Firestone was responsible for the freight to the extent of $1.33 per short ton. This was the full amount of freight from Houston, Texas, but if the shipment originated from Donaldsonville, Louisiana, then Gulf Oil Corporation, the producer of the styrene, paid the difference of 47¢ per short ton.

this service was invoiced one-half to Texas and one-half to Gulf Oil Corporation, the producer of the chemicals. Pursuant to the terms and conditions of the Firestone-Texas contract, Texas invoiced Firestone for the "Styrene Monomer Inspection Fee by E. W. Saybolt & Co., Inc." [4]

5.

Through Mr. Shockey, Vice President of Purchasing in the Akron, Ohio, office, and Mr. Haymon in its Lake Charles office, Firestone had knowledge of the Barge Charter Party by and between Texas and Alamo, although it did not actually receive a copy.[5] Upon contacting Mr. Shockey, Miss Berman, an officer of Texas, was instructed to arrange shipment details with Mr. Haymon, which she did.[6]

6.

The thirteenth term and condition of the Barge Charter Party entered into by and between Texas and Alamo provided:

INSURANCE

Towers liability and P & I coverage shall be carried with 1st class underwriter by Owner [Alamo] for Owners account. Insurance on the cargo shall be carried by Charterer for Charterer's account, including waiver of subrogation rights against Owner.

It is abundantly clear from the record that Texas notified Firestone of this provision of the Barge Charter Party.[7]

Firestone insured the cargo aboard the Barge SUN–CHEM 900.

7.

In order to obtain the information Firestone desired, Miss Berman requested Alamo[8] and Gulf Oil Corporation[9] to notify Texas as soon as the barge was loaded, of the following: the barge number, departure date and time, temperature, net gallons, net pounds, number of barrels, and purity.

8.

Among the other clauses contained in the Barge Charter Party was a standard Both-to-Blame clause, Jason clause, and General Average clause.

4. Texas Invoice No. 6694 marked Texas Chemical Berman # 28. See also Patricia Berman's dep. pp. 23–26.

5. Patricia Berman's dep. pp. 23–26 and Gordon Gauthier's dep. p. 26. Also note that this was not refuted by the Firestone employees who were deposed.

6. Mr. Charles William Baeder, Jr., Traffic Manager in Firestone's Lake Charles office denied any knowledge of the Texas-Alamo barge charter. However, based on the colloquy between Mr. Baeder and examining counsel reported at pp. 11–14 of his deposition, the Court finds the witness' veracity on this point severely tarnished.

7. The following excerpt from pp. 23–24 of Patricia Berman's deposition substantiates this fact:

Q. When you called up Mr. Haymon to discuss the Barge Charter Party, what did you discuss?

A. I called Mr. Haymon. I told him that I was going to be arranging a charter party with Alamo Chemical Co. I asked him whether or not Firestone carried any insurance on their cargo. He said that "yes," they were insured, and that it was very important that I make sure that I always notified him as soon as I heard the name of the barge, the name of the tug, the time it was lifted, and when the specific arrival time was scheduled to Lake Charles.

Firestone's response to this notice was manifested in a memorandum from Mr. R. H. Schake in Firestone's Purchasing Department in Akron, Ohio, to Mr. R. C. Subra, the purchasing agent in Lake Charles, Louisiana, wherein it was provided:

Our contract calls for terms of FOB Shipping Point and since Firestone must insure the material during shipment it is necessary that you advise Mr. R. C. Wall, Insurance Department in Akron the following information on each barge shipment:

1. Date of shipment
2. Barge number
3. Shipping point and destination
4. Value.

8. This request was by letter dated February 28, 1972, from Miss Berman to Mr. U. C. Sudela of Alamo. Exhibit marked Texas Chem. Berman # 7.

9. Texas' communication to Gulf Oil Corporation was by Telex dated February 29, 1972. Exhibit marked Texas Chem. Berman # 10.

**9.**

Texas kept Firestone apprised of every detail and development related to the March 17, 1972, shipment of styrene laden aboard the Barge SUN–CHEM 900.

**10.**

Firestone only received 1,901,424 lbs. of the original 3,200,075 lbs. loaded aboard the Barge SUN–CHEM 900. Firestone had been invoiced for and had paid for the entire shipment. The total damages sustained by Firestone as a result of this deficiency amounted to $76,185.36.[10]

## CONCLUSIONS OF LAW

### Jurisdiction

The Court has jurisdiction of the case by virtue of the admiralty and maritime subject matter of the claims involved. U.S.C. A.Const. Art. 3, § 2; 28 U.S.C. § 1333.

### Agency

Upon the following facts, the Court concludes that a relationship of agency existed between Firestone, as principal, and Texas, as agent:

(a) According to the terms of its contract with Texas, Firestone reserved the right of designating the mode of transportation of the cargo.

(b) Under the same agreement, the responsibility for providing barge transportation was Firestone's.

(c) Title to the styrene passed to Firestone at the producer's plant of origin, where it was loaded aboard the Barge SUN–CHEM 900.

(d) Firestone requested Texas to arrange barge transportation of the cargo on Firestone's account. Texas agreed.[11]

(e) Firestone, not Texas, absorbed the cost of the transportation.

**10.** The invoice price of $.058 per pound multiplied by the loss of 1,298,651 lbs. equals $75,-321.76. Added to this figure is $863.60, representing the freight attributable to the lost weight. The aggregate is $76,185.36.

**11.** The Restatement of Agency, 2d, Vol. 1 § 26 provides:

(f) Firestone knew that Texas had arranged barge transportation with Alamo.

(g) Texas informed Firestone of the details and developments of the transport.

Out of this amalgam of facts and circumstances arose a consensual relation whereby Firestone delegated the arrangement of the barge delivery to Texas on its account.

The agency issue in this matter is analogous to the question resolved by another section of this Court in *U. S. Ore Corporation v. Commercial Transport Corporation*, 369 F.Supp. 792 (E.D.La.1974). In that case, U. S. Ore Corporation arranged for Union Carbide to provide barge transportation for a shipment of its ore from Burnside, Louisiana, to Marietta, Ohio. Union Carbide subsequently contracted with Commercial Transport Corporation for the necessary barges.

During transportation, one of the Commercial barges laden with U. S. Ore's cargo sank. U. S. Ore instituted libel against Commercial to recover its loss of 1,280 tons of manganese ore. Commercial's defense rested upon a provision in its contract with Union Carbide which Commercial asserted exonerated it from liability for loss or damage to the cargo in question. U. S. Ore replied that it was a stranger to the contract between Commercial and Union Carbide and consequently was not affected by its terms.

The court disdained the argument of U. S. Ore and held:

U. S. Ore having title to the ore, caused Union Carbide to arrange for the barges to transport it to Marietta, Ohio. There is, therefore, little doubt that Union Carbide acted as *U. S. Ore's* agent in this matter and bound U. S. Ore to the terms

Authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.

of the above-mentioned contract with Commercial. . . . There is a conflict in the evidence as to whether U. S. Ore had actual knowledge of the terms of the [Commercial-Union Carbide] contract but this question is immaterial. In making the barge arrangements, Union Carbide was acting on U. S. Ore's behalf with U. S. Ore's full authority. U. S. Ore cannot now protest that it was not bound by the contractual arrangements which existed between Union Carbide and Commercial. If U. S. Ore was not informed as to the specifics of such arrangements, it should have taken the trouble to find out. (369 F.Supp. 796–797)

■ As previously stated, responsibility for barge transportation rested upon Firestone; however, at Firestone's request Texas undertook the responsibility to attend to this matter. The signing of the Barge Charter Party by Texas was incidental to the fulfillment of this undertaking. Cargo transportation within the maritime context is ordinarily arranged by maritime contracts. Therefore, Firestone is bound by the terms and conditions of the Barge Charter Party entered into on its account by and between Alamo and its agent, Texas.

In accord with the Court's conclusion is the Restatement, § 50, supra, which provides, inter alia:

When Authority to Contract Inferred

Unless otherwise agreed, authority to make a contract is inferred from authority to conduct a transaction, if the making of such a contract is incidental to the transaction, usually accompanies such a transaction, or is reasonably necessary to accomplish it.

■ Alternatively, Firestone contends that Texas, having bound it to an onerous charter party, breached the duty of care required of an agent. Finding no factual support for this allegation, the Court is constrained to disagree. Mr. Baeder testified of the ten or twelve barge charter parties he has negotiated for Firestone, each has been with Alamo and each was identical to the agreement presently before the Court. The Court cannot conclude that

Texas acted unreasonably in arranging for Firestone the same charter party that it has repeatedly arranged for itself.

### Bill of Lading

The form bill of lading prepared by Gulf Oil Corporation and signed by a deckhand of the Tug HARD WORK provided, inter alia:

. . . all terms and conditions specified in the Charter Party . . . under which this vessel is employed are deemed to be incorporated herein and shall govern the rights of the parties concerned in this shipment.

. . . This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936. If any term of this Bill of Lading be repugnant to such law or enactment, or to the Acts, to any extent, such term shall be void to that extent but no further.

This raises the question whether the provisions of the Charter Party override the legal rights and duties subsisting between the carrier and holder of the bill of lading. A casual reading of COGSA would appear to resolve the issue, for § 5 states:

The provisions of this chapter shall not be applicable to charter parties; but if bills of lading are issued in the case of a ship under charter party, they shall comply with the terms of [the] chapter. (46 U.S.C. § 1305)

The general rule is that the terms of a Charter Party incorporated into a bill of lading may not extend beyond the limits permitted by COGSA; if they do, they will be disregarded. However, this case represents the exception to the rule, for the bill of lading was not a document of title, but rather served the singular purpose of a receipt for the cargo providing a verification of the type and quality of the cargo and the best evidence of the weight or measure of the styrene. Although this exception was carved out prior to the enactment of COGSA, according to Messrs. Gilmore and Black, its efficacy nonetheless continues:

The only apparent exception occurs when the bill of lading has remained in the hands of the charterer. It had been held in a number of pre-COGSA cases that, in such a case, the bill of lading is a mere receipt as between the parties to the charter, and that the charter controls. This rule still has validity. [Gilmore & Black, *The Law of Admiralty* (2d ed. 1975), § 4–10, pp. 218–219 (citations omitted)] [12]

■ On this basis the Court determines that neither the bill of lading nor COGSA governs the rights and duties between the parties to this matter.

### Charter Contract

■ Under the terms of the Barge Charter Party, Firestone, through its agent, contracted for an entire vessel with a specified capacity. Notwithstanding the fact that Firestone was to designate the point of loading, absolute possession and control of the vessel did not pass to the charterer, as it would have under a demise charter, but rather it remained with Alamo. Upon these findings the Court concludes that the vessel provided under the Charter Party was a private carrier.

As one commentator has observed, it has been uniformly held that:

. . . chartered vessels and their owners vis-a-vis the shipper charterer are private carriers. The federal district court, in *Lamb v. Parkman*, stated: "[b]y the charter-party, the whole ship was let to the [charterer], who was to furnish a full cargo, and the owners had no right to take goods for any other person. In no sense were they common carriers, but bailees to transport for hire. . . ." The courts have not regarded the shipowner who charters his vessel to a shipper chartered as exercising a public employment and therefore, . . . the shipowners could not be common carriers.

The designation of a vessel operating under a charter party as a private carrier does not result from the existence of a charter party nor from the intention of the parties but from the fact that the vessel carries the cargo supplied by one person, the charterer. [Chiang, *The Characterization of a Vessel as a Common or Private Carrier*, 48 Tul.L.Rev. 299, 319 (1974)]

The conclusion of the Court on this point is consonant with the decisions within this Circuit. In *Jefferson Chemical Co. v. M/T Grena*, 413 F.2d 864 (5th Cir. 1969), the cargo insurer, as subrogee, filed libel to recover monetary damages from the shipowner arising out of contamination to a shipment of chemical cargo. The shipowner defended on the basis of a clause in the "tanker voyage charter party" exonerating it from liability for damages not caused by lack of due diligence. In rejecting this defense the court held that the shipper had entered into an ordinary contract of affreightment to which COGSA applied, rather than a charter party.

The significance of *Jefferson Chemical* to this case is the Fifth Circuit's rationale in finding that the contract therein was not a charter contract:

Jefferson did not agree to employ the "entire ship", The Monarch of Nassau, 5 Cir. 1946, 155 F.2d 48, 49, or "the full capacity of the ship", Romano v. West India Fruit & Steamship Co., Inc., 5 Cir. 1945, 151 F.2d 727, 730. The essence of a charter agreement is that the charterer employs the entire ship or a substantial portion of it for a particular voyage or a particular period of time from one holding himself out as a public carrier. Gilmore & Black, The Law of Admiralty, § 4–1; Carver, Carriage of Goods by Sea 169 (6th Ed.); Poor, Charter Parties & Ocean Bills of Lading § 1 (3d Ed.). . . On both voyages there were others utilizing the vessel's space for carriage. The agreement did not specify any particular vessel nor any particular space upon a vessel but rather left furnishing of a vessel within the control of [the vessel owner]. During the two voyages [the shipper] used but ten to fifteen percent of the

---

12. See also, 48 Tul.L.Rev. 299.328 (1974).

[vessel's] carrying capacity, and [the shipper] had never shipped as much as the [vessel's] full reach in an entire year, much less a single voyage. Clearly [the vessel owner] held itself out as a common carrier in this case, and the [vessel owner-shipper] agreement was a contract of carriage subject to COGSA. (413 F.2d at 867)

Unlike the facts in *Jefferson Chemical*, the documents and exhibits submitted to the Court in this matter manifest that Firestone did employ the "entire ship" or "full capacity of the ship." [13] It would have been superfluous for Firestone to request particular space upon the barge, for its cargo consumed all of the vessel's carrying capacity.

■ A correlative of the Court's conclusion that the barge was a private carrier under a private charter party is that the risks of damage may be adjusted in any manner specified by the charter. *Horn v. Cia De Navegacion Fruco, S.A.*, 404 F.2d 422, 429 (5th Cir. 1968). This rule of law was applied in *The Monarch of Nassau*, 155 F.2d 48 (5th Cir. 1946). In that case the shipper had chartered the entire capacity of the *Monarch of Nassau* to haul bananas. As a result of the negligent stranding of the vessel, the cargo was partially damaged and lost. The district court declined to apply a provision of the charter party regulating liability in this event. However, finding the vessel to be a private contract carrier, the Fifth Circuit stated:

. . . in such private carriage the parties may contract pretty much as they please, especially if a seaworthy vessel is furnished. 155 F.2d at p. 50.

Thus, the vessel and its owner were permitted to contractually circumvent liability for the cargo damage caused by their negligence.

A similar result was obtained in *Pure Oil Co. v. M/V Caribbean*, 235 F.Supp. 299 (W.D.La.1964). Libel was instituted by Pure Oil Company, the owner of a cargo of petroleum products laden aboard a Silvey-Taylor barge, against the noncarrying vessel. This resulted in a tangled web of third party interpleaders, cross-claims and counterclaims. The cargo damage arose out of a river collision between the tows of the *M/V Caribbean* and the M/V DIANA BRENT, both of which were ultimately found to be jointly and equally at fault.

One of the issues before the court was the liability of Silvey-Taylor for the cargo damage. This raised the question of the validity of the contract between Silvey-Taylor and Pure Oil. By the terms of this agreement Silvey-Taylor agreed to move bulk petroleum products for Pure Oil in named barges, or equivalent substitutes, for a specified rate, subject to the following provision limiting its liability:

"Owner shall carry at its expense Hull and P & I insurance (but not tower's liability covering cargo) to the full value of the tow used in the fulfillment of this contract. Company hereby acknowledges that the towage rate specified herein does not contemplate or include an allowance for liability insurance covering the cargo and as an additional consideration supporting owner's undertakings, company shall and it does hereby agree to hold owner, its tow, masters, crew agents and employees harmless for claims for cargo loss, damage or contamination whether arising or resulting from an act of neglect or default in the navigation or management of the vessel, including but not limited to, explosion, fire, collision, stranding, salvage operations, equipment defect, or other peril, danger or accident of navigable waters or from any other cause of whatsoever kind arising. In furtherance hereof, company agrees to insure the cargo transported hereunder to its full value against all marine perils, including loss, damage or contamination, salvage or general average contribution, etc. and to secure a waiver of assignment and/or subrogation from the cargo underwriters in favor of owner on account of any cargo claims paid by the under-

---

**13.** The Barge Charter Party called for a "barge of approx. 10,200 Bbls. (1500 S.Tons) capacity . . ." and the shipment at issue was of 10,042.48 barrels weighing 3,200,075 pounds.

writers."[14] (235 F.Supp. at pp. 302 and 303)

Finding that the contract between Pure Oil and Silvey-Taylor was a contract of affreightment for the movement and transportation of petroleum products, the court held:

> In private contracts of affreightment, the relationship between the parties is that of bailor-bailee, and the rights and obligations of one to the other are to be determined according to the terms of their agreement. *Sacramento Nav. Co. v. Salz,* [273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663 (1938)], supra, *Commercial Molasses Corp. v. New York Tank Barge Co.,* [314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941)], supra, *Koppers Connecticut Coke Co. v. James McWilliams B. Line,* 89 F.2d 865 (2 Cir. 1937), cert. den. 302 U.S. 706, 58 S.Ct. 25, 82 L.Ed. 545 (1937); *Texas Co. v. Lea River Lines, Inc.,* 206 F.2d 55 (3 Cir. 1953). Cf. *Hartford Accident & Indem. Co. v. Gulf Ref. Co.,* 127 F.Supp. 469 (E.D.La.1954). (235 F.Supp. at pp. 304 and 305)

Upon this legal premise the court concluded that Silvey-Taylor was "entitled to claim the benefit of the provision of its contract of affreightment exonerating them from liability for loss of cargo according to its terms." 235 F.Supp. at p. 305.

This rule of law is concisely stated in Gilmore & Black, supra, § 4–5, at p. 207:

> Charter party carriage, moreover, is normally looked on as "private" carriage, and, as pointed out above, there are no statutory rules forbidding the adjustment of risk for goods damaged in any manner provided by the charter.

 In accordance with the authorities cited herein, the Court finds that rights and duties of Firestone and Alamo are to be ascertained from charter party. Thus the Court shall consider the legal effect of the pertinent provisions of this agreement.

*Insurance Clause*

Firestone has been reimbursed for its loss pursuant to the terms of its insurance policy with Insurance Company of North America (hereinafter referred to as "INA").[15] INA became subrogated to the rights of Firestone against Alamo to the extent of the amount paid to its insured. Relying on the terms of the insurance clause, Alamo contends that it is not responsible for the damage Firestone sustained because the duty to insure the cargo was incumbent upon Firestone. Furthermore, Firestone was required to obtain a waiver of subrogation against Alamo. Although Firestone did have cargo insurance, it did not secure the waiver of subrogation from its insurer.

The controversy concerning this clause of the Barge Charter Party is whether it is valid and enforceable, or whether it falls within the parameters of *Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), which held that a towboat could not validly contract with its tow to relieve the tower from all liability. For the following reasons, the *Bisso* exclusion doctrine should not control the validity of the clauses to the Barge Charter Party involved in this case.

As noted above, when a private carrier and a cargo interest enter into a charter party for the full capacity of a vessel, the contractual freedom that they may exercise is less restrained than when a common carrier is involved. The major reason the liberty enjoyed in this context has withstood the vigilance of "public policy" is a presumption of equality in bargaining strength. The *Bisso* exclusion rule against contracts relieving the tower for liability for its own fault was based on an absence of a similar equality.[16]

---

14. This is the substantive equivalent of clause 8 "Insurance" and clause 18 "Release" of the Barge Charter Party herein.

15. The subrogation receipt from Firestone to INA provides: "Insured's loss $85,460.03 less

insured's deductible of $25,000 underwriter paid $60,460.03 including survey fee of $1,551.59."

16. The Supreme Court articulated two main reasons for its decision in *Bisso*: "(1) to dis-

In *Fluor Western,* supra, a cargo owner filed libel for loss and damage to its cargo, when the barge upon which it was being transported sank. The underwriters who insured the cargo paid the cargo owner and sought recovery against the owner of the barge. In defense, the barge owner urged that the rights of subrogation had been contractually waived. Cargo countered contending that the contract was contrary to the public policy announced in *Bisso* because it required cargo to obtain cargo insurance and waive subrogation against the barge owner.

Holding that the *Bisso* rationale was inapplicable in this context, the Fifth Circuit enumerated the following three reasons underlying its conclusion:

(1) The plaintiff did not waive its right to proceed against any party responsible for the cargo loss. Under the terms of the insurance clause, the cargo owner nevertheless had the right to proceed against the barge, tug and their owners if the insurer failed to pay.

(2) No rights were waived by the insured for the charter party did not bind the cargo insurer. Subrogation rights were waived by a subsequent and independent agreement between the cargo owner and its underwriter.

(3) Designating by contract who should shoulder the burden of paying the insurance premiums is not invalid under *Bisso,* particularly when the party that does bear the cost had an insurable interest in the cargo and is to be the named insured.

The Fifth Circuit's tripodal reasoning in determining the enforceability of the insurance clause is as relevant in the instant case as it was in *Fluor Western.*

■ The insurance clause being valid, the Court concludes that Firestone breached this provision by failing to obtain a waiver of subrogation from INA. Since a waiver could have only been secured by an agreement between INA and Firestone and not by an agreement between Alamo and Firestone, INA may pursue Firestone's cargo claim against Alamo. The measure of damages for Firestone's breach shall be the amount of damages recovered by INA against Alamo, if any.

### Release Clause

Under the terms and conditions of clause 18 of the Barge Charter Party, Alamo assumed responsibility for loss of or damage to the cargo as a result of its failure: (1) to exercise due diligence to make its vessel and other equipment seaworthy and properly manned, equipped and supplied; (2) to exercise reasonable care in receipt, storage, handling, care and delivery of the cargo. Clause 18 further provides that if Alamo fulfilled these obligations, then neither it nor its employees, vessel, barge or other equipment shall be liable for any loss of or damage to Firestone's cargo. The clause is valid and enforceable.

Although neither the Harter Act, nor COGSA apply in this case, it is noteworthy that the obligations imposed upon a common carrier under these acts are the same as those imposed upon Alamo under clause 18.

■ During the liability stages of this bifurcated matter, the Court found that Alamo's fault was attributable to its negligence in management and navigation.

courage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods and services from being overreached by others who have [the] power to drive hard bargains." 349 U.S. at 90, 91, 75 S.Ct. at 632. In commenting upon the *Bisso* doctrine, the Fifth Circuit opined:

It appears that the overriding consideration in *Bisso* was the supposed inequality of the bargain position of the tug industry and those in need of its services. The other reason

stated in *Bisso* for the rule there announced—to discourage negligence by making wrongdoers pay damages—was, I believe, of limited importance and merely served to support the decision, for, in absence of an unconscionable disparity in bargain positions, contracting parties should be free to distribute liabilities and costs as they wish. [*Fluor Western, Inc. v. G & H Offshore Towing Co., Inc.,* 447 F.2d 35 (5th Cir. 1971)]

Based on this Court's earlier decision, the Court concludes that Alamo has satisfied its obligation of due diligence and reasonable care as defined in clause 18. Accordingly, Alamo is not liable to Firestone, nor its subrogated underwriter, for the loss of or damage to the latter's cargo of styrene.

## FORM OF JUDGMENT

For over a century the rule in admiralty law has endured that the cargo owner, whose property is lost or damaged while being transported on board a carrying vessel, is entitled to judgment for the full amount of its damages from the noncarrying vessel, if the latter vessel has by its own fault contributed to the collision.[17] The reporters are replete with cases explaining this rule on the basis that the colliding vessels are like joint tort feasor; therefore, the cargo owner can obtain a judgment for the full amount of its damage against the noncarrying vessel.

The cargo owner generally initiates this action, as in this case, against the noncarrying vessel because under the Harter Act, COGSA, or a contractual provision, the carrying vessel and its owners are typically insulated from liability due to negligence in the management or navigation of the vessel.

However, whatever liability the carrier eludes directly, attaches indirectly through the circuitous operation of the principle of *The Chattahoochee*, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801 (1899). According to the decision of *The Chattahoochee*, which was decided under the divided damages rule, the noncarrying vessel computes any payments made to the cargo owner in satisfaction of a judgment as part of its collision damage. This amount is added to the collision damage sustained by the carrying vessel. The aggregate is then equally divided between the colliding vessels, with the vessel sustaining the least amount of damage contributing to the other vessel an amount sufficient to equalize the damages.

In an effort to vitiate what was perceived as an anomaly in the law,[18] carriers inserted what is commonly known as "Both to Blame" clauses into either the charter party or bill of lading. Clause 19 of the Barge Charter Party in this case is a Both to Blame clause.[19] According to the terms of this provision Alamo is entitled to full indemnification from Firestone for the amount it is required to pay the M/V OVERSEAS VALDES for the damage to Firestone's cargo.

In 1952 the Supreme Court closed and secured the escape hatch provided by the Both to Blame clause by holding:

> Assuming for the moment that all rules of law must be symmetrical we think it would be "anomalous" to hold that a cargo owner, who has an unquestioned right under the law to recover full damages from a noncarrying vessel, can be compelled to give up a portion of that recovery to his carrier because of a stipulation exacted in a bill of lading. (*United*

---

17. *The Atlas*, 93 U.S. 302, 23 L.Ed. 863 (1876); *The Beaconsfield*, 158 U.S. 303, 15 S.Ct. 860, 39 L.Ed. 993 (1895); *The New York*, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126 (1899).

18. The dissenting opinion in *United States v. Atlantic Mutual Insurance Company*, 343 U.S. 236 at 247–248, 72 S.Ct. 666 at 672, 96 L.Ed. 907 (1952), best described this "anomaly."

> To derive from a statute [the Harter Act], which relieves a ship entirely of liability to cargo when the ship is wholly to blame for the loss, an implied restriction against a voluntary arrangement for relief from liability when the ship is only half to blame, is surely an odd use to which to put such a statute.

19. Clause 19 provides:
INDEMNITY: If the tow comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of Owner or the master or crew of the tow, for which, or for the consequence of which, Owner is not responsible to Charterer, by statute or contract or otherwise, Charterer and the other parties having an interest in the cargo shall, jointly and severally, indemnify Owner against all liability to the other vessel or her owners or the owners of the cargo of the other vessel with respect to any payment which Charterer or such other parties have received or may be entitled to receive from the other vessel or her owners, or the owners of the cargo of the other vessel.

*States v. Atlantic Mutual Insurance Co.,* supra, 343 U.S. at 239, 72 S.Ct. at 669)

However, as a result the Court's apostasy in 1975 concerning divided damages,[20] the question arises whether a cargo owner still has an absolute right to recoup its full damages from a noncarrying vessel. In *Reliable Transfer*, the Supreme Court abandoned the divided damages rule for the more equitable approach of allocating damages in proportion to the relative degree of fault.

Two alternatives confront the Court. Firestone is either entitled to recover from the M/V OVERSEAS VALDES 20% or 100% of its cargo damage. If Firestone is permitted to recover 100% of its cargo damage from the M/V OVERSEAS VALDES, then said vessel will be entitled to indemnification from Alamo for 80% of this amount. However, should the Court restrict Firestone's recovery of its cargo damage against the M/V OVERSEAS VALDES to said vessel's percentage of fault, then by operation of the Release clause, Firestone would not have a right against Alamo for the balance.

The only other reported decision to consider this question is *Complaint of Flota Mercante Grancolombiana, S.A.,* 440 F.Supp. 704, 725 (S.D.N.Y.1977). Therein the court held:

> This Court believes that the better rule would be to allow the Cargo Claimants a full recovery against the non-carrying vessel, allow the latter to add the payments it makes to cargo to its own damages, and then permit it to recover this total from the carrying vessel in proportion to the fault of the carrying vessel. This resolution would be more in accord with the principles enunciated in *Reliable Transfer*, which allocated liability proportionately among the parties at fault. No fault can be alleged or proved as against the innocent cargo owners. In the absence of a clear directive from the Supreme Court overruling prior cases, Gran-

colombiana's fault should not be imputed to the Cargo Claimants here. *Reliable Transfer* was intended to change the rule of damages so that the burden would fall more equitably on those parties whose fault contributed to the collision. It cannot be said, as Hudson urges here, to have altered long-established rules by imputing the fault of the carrying vessel to innocent cargo owners.

This Court disagrees. The purpose of *Reliable Transfer* is clearly articulated by the Supreme Court as:

> [W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, *liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault* . . . . (421 U.S. 412, 95 S.Ct. 1715–1716)

In supplanting the divided damages rule with the rule of comparative damages, the Court expressed its disdain for the prior rule that permitted "allocation of disparate proportional fault" by characterizing it as "unnecessarily crude and inequitable" and "archaic and unfair".

To grant Firestone a judgment for the full amount of its damages against the M/V OVERSEAS VALDES, which vessel's degree of fault in causing the collision and resulting cargo damage was previously determined to be only 20%, would be in violent contradiction to *Reliable Transfer*. Although the orbital approach adopted in *Complaint of Flota Mercante Grancolombiana, S.A.* may have ultimately accomplished the intent of the comparative damages rule under the facts of that case, nevertheless in the process it was necessary to allocate to the noncarrying vessel disparate proportional fault. In the event that the carrying vessel should be insolvent or limit its liability to an insufficient fund, this procedure would produce the kind of inequitable, archaic and unfair result, denounced in *Reliable Transfer*.

---

**20.** *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

■ Under the principle of *Reliable Transfer*, Firestone does not have an unqualified right to recover its full damages from the M/V OVERSEAS VALDES, but rather its recovery is limited to that vessel's percentage of fault in causing the damage. Because Firestone must pursue its cargo claim directly against Alamo, it is precluded from recovery by operation of the Release clause.

Another basis for the Court's conclusion that Firestone's recovery for cargo damage is limited to 20% against the M/V OVERSEAS VALDES is that the Both-to-Blame clause is in a private charter party involving a private carrier. In *Atlantic Mutual Insurance Co., supra*, wherein the court struck down the Both-to-Blame clause, the only question presented to the court was "whether the 'Both-to-Blame' clause is . . . void and unenforceable as a violation of the long-standing rule of law which forbids common carriers from stipulating against the consequence of their own employee's negligence." In holding that it was, the court stated:

> There is a general rule of law that common carriers cannot stipulate for immunity from their own or their agents' negligence. While this general rule was fashioned by the courts, it has been continuously accepted as a guide to common-carrier relationships for more than a century.

Clearly, the context in which the Both-to-Blame clause was rejected in *Atlantic Mutual Insurance* was confined to common carrier relationships.

This rationale was apparently employed in *Pure Oil, supra*, a case decided under the divided damages rule. That case involved a clause in the contract of affreightment exonerating the carrier from liability to the cargo owner for loss of or damage to the cargo. The judgment granted by the court in favor of the cargo owner was limited to recovery against the noncarrying vessel for 50% of the amount of its cargo damage, whereas the carrying vessel was not liable for the remaining 50%. On appeal the Fifth Circuit affirmed the form of the judgment.

■ The relevancy of *Pure Oil* to the matter presently before the Court is that it dealt with a private carrier under a charter party. In this context, a Both-to-Blame clause is valid and controls the rights and obligations of the parties thereto.

Accordingly, Firestone's recovery is limited to 20% of its cargo damage from the M/V OVERSEAS VALDES.

## GENERAL AVERAGE

■ General Average is a venerable doctrine of maritime law which provides that where a portion of ship or cargo is sacrificed to save the residue from a real and substantial peril, each owner of property saved contributes in proportion to the value of that property to make up the loss of those whose property has been sacrificed for the common benefit. It was early established that there is generally no right to general average contribution where the one seeking contribution was responsible for the occurrence of the general average situation.[21] With the passage of the Harter Act in 1893, a vessel owner exercising due diligence to make his vessel and its equipment seaworthy and properly manned, equipped and supplied, is no longer liable for negligence in the navigation and management of the vessel.

Notwithstanding this Congressional enactment, it was held in *The Irrawaddy [Flint v. Christall]*, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130 (1898), that while the Harter Act relieved the shipowner from liability for his servant's negligence, it did not of its own force entitle him to share in a general average rendered necessary by such negligence.

In *The Jason*, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969 (1912), the Supreme Court concluded that it was no longer against the policy of the law for a shipowner to contract with cargo owners for participation in general average contribution growing out

21. *The Portsmouth*, 76 U.S. (9 Wall.) 682, 19 L.Ed. 754 (1870).

of the negligence of the master or crew, provided the clause stipulates that the ship-owner shall share in the general average only under circumstances whereby he is relieved from responsibility under the Harter Act.

This clause, known as the Jason clause which has become standard in most bills of lading, "allows general average under any statute (COGSA, for example, enacted in 1936) or contract (charter parties may go beyond COGSA in exculpating the carrier)." *Benedict on Admiralty*, 7th ed. 1975, § 186, pp. 13–20. The clause provides:

> In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred, in respect of the goods. (Benedict on Admiralty, supra, p. 13–20) [22]

In this matter Alamo has made a claim against Firestone for general average contribution for the expenses it incurred in salvaging the barge and cargo. INA, the subrogee of the cargo claim, has executed an "average agreement" with Alamo pursuant to which Messrs. Adams and Porter are to adjust and declare the general average expenses. Firestone does not dispute that general average is owing, but contends that it is not the proper party from whom it is due. Inasmuch as the Court has previously concluded that Texas was acting as Firestone's agent in entering into the barge charter party, Firestone is bound by the terms and conditions of its agreement.

That agreement provides that Firestone shall contribute in general average to the payment of any expenses of a general average nature, specifically including salvage, when the damage is caused by circumstances for which Alamo is not responsible to Firestone by statute, contract, or otherwise. In ascertaining whether Firestone is responsible for general average contribution under this clause, the Court must initially determine whether the sinking of the barge and resulting cargo damage is an event for which Alamo is liable to Firestone. Inasmuch as neither COGSA nor Harter govern the Alamo-Firestone relationship, attention must be focused upon the Release clause of the Barge Charter Party.

Commenting upon a Jason clause cast in identical terms as the one being considered, Gilmore & Black state:

> . . . In a general average case, the issue as to liability of the cargo to contribute may often, therefore, involve exactly the same questions as would have arisen had the case been one of cargo damage, for, under such a clause, the ship is entitled to recover general average expenses in just exactly the same cases as those in which it would have been immunized against cargo claims, had cargo been damaged. (Gilmore & Black, supra, at p. 267)

The Court has decided in an earlier opinion that the fault attributable to Alamo was based exclusively on its negligence in the management and navigation of its vessel. The Court determined above that Clause 18 insulated Alamo from liability for cargo damage based on its negligence. Accordingly, the Court is constrained to conclude that Firestone must respond in general average contribution to the expenses incurred by Alamo in the salvage of the barge and its cargo.

---

22. Clause 16 of the Barge Charter Party between Alamo and Firestone is written in precisely the same language with the "additional provision" that general average shall be settled according to York-Antwerp Rules and the usages and customs of the Port of New York. This

addition does not diminish the efficacy of the Jason Clause. See Gilmore & Black, § 5.5, p. 253 and *Orient Mid-East Lines, Inc. v. Shipment of Rice, etc.*, 496 F.2d 1032 (5th Cir. 1974).

## SUMMARY

Upon the foregoing legal authorities the Court concludes:

(1) Texas was Firestone's agent for the purpose of arranging barge transportation of the styrene shipment from Donaldsonville, Louisiana, to Lake Charles, Louisiana. Entering into the Barge Charter Party on behalf of Firestone was incidental to the purpose of this agency. Texas faithfully performed the duties of its agency. Firestone is bound by the terms and conditions of the Charter Party.

(2) Firestone had the use of the entire capacity of Alamo's vessel, a private carrier, under the provisions of a Charter Party.

(3) The terms and conditions of the Charter Party are valid and enforceable.

(4) Alamo is immunized from Firestone's claim for cargo damage by the operation of "Clause 18: Release."

(5) Firestone is entitled to recover 20% of its cargo damage against the M/V OVERSEAS VALDES and its owner Maritime Overseas Company.

(6) Firestone must contribute to the general average expenses incurred by Alamo.

(7) Although Firestone breached "Clause 13: Insurance," by not obtaining a waiver of subrogation, inasmuch as no liability attached to Alamo for the damage to Firestone's cargo, no damage resulted from Firestone's breach.

Accordingly, for the reasons set forth in this opinion, IT IS ORDERED that judgment be entered in favor of the defendant in intervention, Alamo, and against the plaintiff in intervention, Firestone, for General Average contribution; and that Firestone's claim against Alamo for damage to its cargo be and is hereby DISMISSED.

IT IS FURTHER ORDERED that judgment be entered in favor of Firestone and against the M/V OVERSEAS VALDES and its owner, Maritime, for $15,237.07, 20% of its cargo damage; and that Maritime's counterclaim for recovery over against Alamo, for the amount it is found liable to Firestone, be and is hereby DISMISSED.